UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

ABDUL MEHAMED SIED,

        Plaintiff,

    v.

KIRSTJEN NIELSEN, et al.,

        Defendants.

Case No. 17-cv-06785-LB

**ORDER EXERCISING JURISDICTION OVER HABEAS PETITION AND GRANTING PRELIMINARY INJUNCTION**

Re: ECF No. 2, 28, 30, 31, 36

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................. 4

STATEMENT .................................................................................................................................. 5

1.  In May 2016, Mr. Sied Sought Asylum and Withholding of Removal, but His Requests Were Denied in a One-Page Form Order That Ordered Him Deported to Eritrea ..................... 5

2.  Because Eritrea Historically Refused to Accept Repatriation of Its Citizens, the Government Did Not Deport Mr. Sied to Eritrea and Instead Released Him Under an Order of Supervision ............................................................................................................... 7

3.  On September 13, 2017, the Government Announced Visa Sanctions on Eritrea to Pressure It to Accept Deportations from the United States, and on September 28, 2017, the Government Seized and Re-Detained Mr. Sied ......................................................................... 7

4.  In October 2017, a Demonstration Arose in Eritrea, and in Response, the Eritrean Government Began a Crackdown .......................................................................................... 8

5. In November 2017 — on the Wednesday Before Thanksgiving — the Government Told Mr. Sied It Was Going to Deport Him and Made Arrangements to Deport Him to Eritrea the Following Monday ........................................................................................ 10

6. Over Thanksgiving, Mr. Sied Obtained Pro Bono Counsel, Who Filed an Emergency Habeas Petition and Sought an Injunction to Stay the Government from Deporting Mr. Sied to Eritrea While He Attempted to Reopen His Immigration Case .................................. 10

7. The Government Maintains That Under 8 U.S.C. § 1252(a)(5), (b)(9), (d)(1), and (g), This Court Has No Jurisdiction to Hear Mr. Sied's Habeas Petition, and That Mr. Sied Should Instead File a Motion to Reopen Before an Immigration Judge ............................... 11

8. Mr. Sied Wants to Pursue the Motion-to-Reopen Process Before an Immigration Judge, but He Brings This Habeas Petition Because He Fears That the Government Will Deport Him Before His Motion Can Be Heard ................................................................. 12

9. An Alien Subject to Removal Has a Statutory Right to File a Motion to Reopen Before an IJ or the BIA ........................................................................................... 13

10. There Are Limited Procedural Protections in the Administrative Motion-to-Reopen Process to Prevent the Government From Deporting an Alien from the United States While the Process Is Pending ........................................................................... 14

    10.1 There Is No Mechanism to Prevent the Government from Deporting an Alien When the Alien Moves an IJ to Stay Deportation But the IJ Has Not Ruled on That Motion .. 15

    10.2 There Is No Mechanism to Prevent the Government from Deporting an Alien Where the IJ Denies the Alien's Motion to Stay Deportation but Has Not Ruled on the Underlying Motion to Reopen ..................................................................... 16

    10.3 There Is No Mechanism to Prevent the Government from Deporting an Alien When the Alien Moves the BIA to Stay Deportation but the BIA Has Not Ruled on That Motion, or Where the BIA Denies the Alien's Motion to Stay Deportation but Has Not Ruled on the Underlying Motion to Reopen ............................................ 17

11. The Government Concedes That If It Deports Mr. Sied to Eritrea, Mr. Sied Will Be Denied the Opportunity to Pursue the Motion-to-Reopen Process ........................................... 18

12. The Government Refuses to Agree or Provide Any Assurance That It Will Not Deport Mr. Sied to Eritrea While the Motion-to-Reopen Process Is Pending ............................................. 19

**JURISDICTIONAL ANALYSIS** ..................................................................... **20**

1. Sections 1252(a)(5) and (b)(9) Do Not Divest This Court of Jurisdiction over Mr. Sied's Petition ..................................................................................................... 20

    1.1 Sections 1252(a)(5) and (b)(9) Do Not Apply to a Habeas Petition That Is Not a "Direct Challenge to an Order of Removal" ................................................ 21

1.1.1 Habeas petitions are not direct challenges to a removal order where (1) the grounds for the petition arose after the removal order was entered and (2) the relief sought is only "a day in court" at a subsequent proceeding ........................ 22

1.1.2 Habeas petitions are not direct challenges to a removal order where they request only a stay of removal in connection with a motion to reopen based on changed country conditions ................................................................. 24

1.1.3 Recent district-court decisions in this circuit confirm that when the government threatens to remove aliens before they can be heard on motions to reopen, a district court has jurisdiction to hear a habeas petition requesting a stay of removal ................................................................................ 25

1.2 The Government's Arguments That Sections 1252(a)(5) and (b)(9) Divest This Court of Jurisdiction Fail ................................................................. 27

1.2.1 The court disagrees that Mr. Sied's habeas petition and his motion to reopen are based on the same argument ........................................................ 27

1.2.2 The government cites no binding authority that holds that Section 1252(a)(5) or (b)(9) divests this court of jurisdiction over Mr. Sied's habeas petition .......... 29

1.2.3 The government cites no persuasive authority from a higher court that holds that Section 1252(a)(5) or (b)(9) divests this court of jurisdiction over Mr. Sied's habeas petition ................................................................. 31

1.2.4 The district-court cases that the government cites are not persuasive in establishing that Section 1252(a)(5) or (b)(9) divests the court of jurisdiction over Mr. Sied's habeas petition, particularly in light of countervailing Ninth Circuit precedent ................................................................................ 33

2. Section 1252(d)(1) Does Not Divest This Court of Jurisdiction over Mr. Sied's Petition ....... 35

3. Section 1252(g) Does Not Divest This Court of Jurisdiction over Mr. Sied's Petition ........... 36

4. An Interpretation That Section 1252(a)(5), (b)(9), (d)(1), or (g) Divests the Court of Jurisdiction over Mr. Sied's Habeas Petition Would Violate the Suspension Clause ............. 38

**PRELIMINARY-INJUNCTION ANALYSIS ................................................................. 43**

1. Mr. Sied Has Raised Serious Questions on the Merits of His Habeas Claim ........................ 44

2. Mr. Sied Has Shown That He Is Likely to Suffer Irreparable Harm in the Absence of a Stay ................................................................................................................. 45

3. Mr. Sied Has Shown That the Balance of Equities Tips Strongly in His Favor ..................... 45

4. Mr. Sied Has Shown That a Stay Is in the Public Interest ................................................ 45

**CONCLUSION ................................................................................................. 46**

ORDER – No. 17-cv-06785-LB

3

**INTRODUCTION**

Petitioner Abdul Mehamed Sied, a Jeberti Muslim originally from Eritrea who is currently in the custody of U.S. Immigration and Customs Enforcement ("ICE"), has brought a motion before an administrative immigration judge ("IJ") to reopen his immigration case and apply for asylum and withholding of removal (deportation).[1] Mr. Sied fears that the Eritrean government — which purportedly has begun persecutions, particularly of Jeberti Muslims, starting in November 2017 — may torture, murder, or disappear[2] him if he is forced to return to Eritrea.

On paper, Mr. Sied has a statutory right to file a motion to reopen and seek asylum or withholding of removal. What happens in practice is another story. Mr. Sied can file a motion to reopen, but the government maintains that it can deport Mr. Sied to Eritrea before an IJ actually hears his motion. To paraphrase another court that examined the government's position in a similar case, this leaves Mr. Sied with the Kafkaesque prospect that the government might deport him to Eritrea to be tortured or killed, while he awaits a hearing and decision on his motion that he should not be deported to Eritrea because he would be tortured or killed there. *Devitri v. Cronen*, __ F. Supp. 3d __, No. 17-11842-PBS, 2018 WL 661518, at *4 (D. Mass. Feb. 1, 2018).

Mr. Sied filed this petition for habeas corpus, asserting that the government's threat to deport him to Eritrea before the IJ considers his motion to reopen violates his right to constitutional due process. Mr. Sied does not seek to circumvent the standard administrative procedures for filing his motion to reopen. He seeks only a meaningful opportunity for his motion to reopen to be heard — and to not be deported to a country where he could be tortured or killed before he can have that day in court.

---

[1] In this context, "the terms 'deportable' and 'deportation' can be used interchangeably with the terms 'removable' and 'removal,' respectively." *Lolong v. Gonzales*, 484 F.3d 1173, 1177 n.2 (9th Cir. 2007) (en banc).

[2] "Disappear" is typically used as an intransitive verb (e.g., "my keys disappeared"). It also has a transitive usage, however (e.g., "the authorities disappeared him," "he was disappeared") — meaning "[t]o abduct or arrest (a person), esp. for political reasons, typically killing or imprisoning the individual, without making his or her fate known." *Disappear*, Oxford English Dictionary (2018), *available at* http://www.oed.com/view/Entry/53500 (last visited Mar. 2, 2018); *see Kaweesa v. Ashcroft*, 345 F. Supp. 2d 79, 83 n.2 (D. Mass. 2004).

The government concedes that Mr. Sied has a statutory right to file a motion to reopen his immigration case. The government further concedes that Mr. Sied's putative motion has merit. The government further concedes that if it deports Mr. Sied to Eritrea, he would not be able to meaningfully pursue his motion. But the government refuses to offer any assurance to not deport Mr. Sied to Eritrea before his motion can be heard. And after Mr. Sied filed his habeas petition, the government challenged the court's jurisdiction to hear Mr. Sied's petition or to provide Mr. Sied with any relief.

It would raise serious constitutional concerns if the government, by deporting Mr. Sied, left him with no meaningful opportunity to be heard, either through administrative remedies before an IJ and Board of Immigration Appeals ("BIA") or through judicial review. The court does not reach the constitutional question, however, because the statutes that the government relies on in arguing that this court lacks jurisdiction over Mr. Sied's petition — 8 U.S.C. § 1252(a)(5), (b)(9), (d)(1), and (g) — do not divest the court of jurisdiction.

The court holds that it has jurisdiction over Mr. Sied's petition and can determine if he should be afforded relief. Additionally, Mr. Sied has met the requirements for a preliminary injunction staying his deportation, and the court therefore enjoins the government from removing Mr. Sied from the United States while his motion-to-reopen process is pending.

## STATEMENT

### 1. In May 2016, Mr. Sied Sought Asylum and Withholding of Removal, but His Requests Were Denied in a One-Page Form Order That Ordered Him Deported to Eritrea

Petitioner Abdul Mehamed Sied was born in 1985 in Asmara, in what was then part of Ethiopia and now is the capital of Eritrea.[3] He and his family are Muslims and members of the Jeberti tribe and lived in the Akriya neighborhood of Asmara.[4]

---

[3] Sied Decl. – ECF No. 3 at 2. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[4] *Id.*

Mr. Sied attests that in May 2010, Eritrean government agents detained him and accused him of advocating on behalf of Jebertis and being part of a government-opposition group.[5] During his approximately two-week detention, the police interrogated him, beat him with electrical cords, and threatened to break his legs.[6] Approximately one week after his release, three police officers approached him in the street and asked, "Are you the one who claims to be Jeberti?" and then beat him unconscious, breaking his jaw and putting him in the hospital.[7]

Mr. Sied attests that in 2013, he tried to leave Eritrea, but Eritrean government agents caught and beat him and sent him to a political-indoctrination military camp.[8] After about four months, he escaped when a vehicle that was transporting him broke down.[9] He hid in Asmara for about one year, before fleeing Eritrea in 2015.[10] From there, he made his way through a number of countries, arriving in the United States on January 10, 2016.[11]

When Mr. Sied arrived in the United States, he requested asylum and withholding of removal under the U.N. Convention Against Torture.[12] ICE transported him to Florida and detained him until his immigration hearing.[13] Because Mr. Sied does not speak English, another inmate helped him fill out his asylum-request forms.[14] On May 10, 2016, Mr. Sied appeared (alone and without counsel) before an IJ, who held a hearing and entered a one-page form order denying his request for asylum and withholding of removal and ordering him removed to Eritrea.[15] Mr. Sied waived

---

[5] *Id.* at 2–3.

[6] *Id.* at 3.

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.* at 3–4.

[12] *Id.* at 4.

[13] *Id.*

[14] *Id.*

[15] *Id.*; [First] Sclater Decl. Ex. A (IJ Order) – ECF No. 5 at 4–5.

his right to appeal the order because, he attests, he thought doing so would mean that he would be released from ICE custody sooner.[16]

### 2. Because Eritrea Historically Refused to Accept Repatriation of Its Citizens, the Government Did Not Deport Mr. Sied to Eritrea and Instead Released Him Under an Order of Supervision

The government did not deport Mr. Sied from the United States and return him to Eritrea, apparently because Eritrea historically refused to accept repatriation of its citizens from the United States.[17] Instead, ICE held Mr. Sied in custody in Florida for an additional six months. In November 2016, Mr. Sied filed a pro se habeas petition, and ICE released him on an order of supervision.[18] Mr. Sied asked, and was granted permission, to move from Florida, first to Nevada and then to California.[19] After moving to California, he checked in on a regular basis with ICE officials.[20] He has not had any criminal arrests or problems with the police and has complied with the terms of his order of supervision.[21]

### 3. On September 13, 2017, the Government Announced Visa Sanctions on Eritrea to Pressure It to Accept Deportations from the United States, and on September 28, 2017, the Government Seized and Re-Detained Mr. Sied

On September 13, 2017, the Department of Homeland Security, in coordination with the State Department, announced that the government would impose visa sanctions on Eritrea (and three

---

[16] Sied Decl. – ECF No. 3 at 4.

[17] Press Release, U.S. Dep't of Homeland Sec., *DHS Announces Implementation of Visa Sanctions on Four Countries* (Sept. 13, 2017) (attached as [Second] Rocca Decl. Ex. D – ECF No. 21-2 at 24–27) ("Acting Secretary of Homeland Security Elaine Duke notified Secretary of State Rex Tillerson that the governments of Cambodia, Eritrea, Guinea, and Sierra Leone have denied or unreasonably delayed accepting their nationals ordered removed from the United States. . . . Without a travel document issued by an alien's home country to confirm identity and nationality, ICE cannot complete the removal process, with very limited exceptions. . . . These four countries have not established reliable processes for issuing travel documents to their nationals ordered removed from the United States").

[18] Sied Decl. – ECF No. 3 at 4.

[19] *Id.*

[20] *Id.*

[21] *Id.*

other countries) "due to lack of cooperation [of these countries] in accepting their nationals ordered removed from the United States."[22] The government announced that "[t]he suspension will remain in place on each of these respective countries until the Secretary of Homeland Security notifies Secretary [of State Rex] Tillerson that cooperation on removals has improved to an acceptable level."[23]

On September 28, 2017, Mr. Sied went to ICE for his regular check-in appointment under his order of supervision.[24] When he arrived there, a different officer (not his normal officer) made him sign a paper written in English.[25] No interpreter was present, and Mr. Sied does not know what the paper said.[26] ICE then seized him and placed him in custody in the ICE detention facility in Richmond, California.[27]

### 4. In October 2017, a Demonstration Arose in Eritrea, and in Response, the Eritrean Government Began a Crackdown

On October 31, 2017, a protest arose in the Akriya neighborhood of Asmara (Mr. Sied's neighborhood).[28] Following the protest, the Eritrean government reportedly began a crackdown on

---

[22] Press Release, U.S. Dep't of Homeland Sec., *DHS Announces Implementation of Visa Sanctions on Four Countries* (Sept. 13, 2017) (attached as [Second] Rocca Decl. Ex. D – ECF No. 21-2 at 24–27); *see also* Susan B. Glasser, *U.S. Slaps Visa Sanctions on 4 Nations*, Politico, Sept. 13, 2017 (attached as [Second] Rocca Decl. Ex. E – ECF No. 21-2 at 28–31).

[23] Press Release, U.S. Dep't of Homeland Sec., *DHS Announces Implementation of Visa Sanctions on Four Countries* (Sept. 13, 2017) (attached as [Second] Rocca Decl. Ex. D – ECF No. 21-2 at 24–27).

[24] Sied Decl. – ECF No. 3 at 4.

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] Reuters Staff, *Gunfire Heard in Eritrea's Capital as Protests Break Out, U.S. Embassy Says*, Reuters, Nov. 1, 2017 (attached as [Second] Rocca Decl. Ex. F – ECF No. 21-2 at 32–24); Felix Horne, *Mystery Surrounds Rare Protest in Eritrea*, Human Rights Watch, Nov. 3, 2017 (attached as [Second] Rocca Decl. Ex. G – ECF No. 21-1 at 35–37); Abraham T. Zere, *How a Rare Protest Scared the Eritrean Regime*, Al Jazeera, Nov. 10, 2017 (attached as [Second] Rocca Decl. Ex. H – ECF No. 21-2 at 38–42); U.S. Embassy in Eritrea, *Security Message for U.S. Citizens: Protests in Asmara* (Oct. 31, 2017) (attached as [Second] Rocca Decl. Ex I – ECF No. 43–45); Berhan Ahmed and Maher Mughrabi, *Plea to Canberra From Relatives of Jailed Eritrea Protestors*, The Age, Dec. 17, 2017 (attached as [Third] Rocca Decl. Ex. G – ECF No. 28-1 at 38–43); Plaut Decl. – ECF No. 21-4 at 2 (¶ 4).

Akriya residents. According to Mr. Sied's family friend Abduselam Abdai Mohammed (a U.S. permanent resident originally from Asmara who has family and friends there), the Eritrean government has arrested over 50 people, including Mr. Mohammed's uncle — who was arrested by government authorities after speaking out in support of freedom and religious tolerance — and three of Mr. Mohammed's cousins.[29] No one has heard from them since their arrest.[30] Mr. Mohammed states that the Eritrean government has begun arbitrarily arresting and detaining Akriya residents, and in particular, Jeberti Muslims like Mr. Sied.[31]

The Australian newspaper *The Age* has reported that in the wake of the October 2017 protest, the Eritrean government has detained more than 2000 people, who are being held incommunicado.[32] Similarly, Martin Plaut, a Senior Research Fellow at the Institute of Commonwealth Studies at the University of London who focuses on Eritrea (and who was previously the Africa reporting editor for the BBC from 2003 to 2013) stated in a declaration submitted on Mr. Sied's behalf:

> Eritrean government forces taking severe action to crush a protest in Akriya is entirely consistent with the way it functions by maintaining an atmosphere of fear among its citizenry and silencing those who voice their opposition to the regime. At the same time, the government's attempt to take control away from the school's religious authorities is a fresh abrogation of the rights of religious freedom in the country. There are absolutely no consequences for arrests without charge, indefinite detention, interrogation, torture and other human rights abuses committed with impunity by the Eritrean government and its agents.[33]

---

[29] Mohammed Decl. – ECF No. 4 at 3–4 (¶¶ 7–9).

[30] *Id.* at 4 (¶¶ 8–9).

[31] *Id.* at 3 (¶ 5).

[32] Ahmed and Mughrabi, *supra* note 28 (attached as [Third] Rocca Decl. Ex. F – ECF No. 28-1 at 32–37).

[33] Plaut Decl. – ECF No. 21-4 at 3 (¶ 7).

**5. In November 2017 — on the Wednesday Before Thanksgiving — the Government Told Mr. Sied It Was Going to Deport Him and Made Arrangements to Deport Him to Eritrea the Following Monday**

On Wednesday, November 22, 2017 — the day before Thanksgiving — ICE woke Mr. Sied at 3:00 a.m. and transported him from the Richmond detention center to an interview with an ICE officer in San Francisco.[34] The ICE officer told Mr. Sied that the government was going to deport him to Eritrea.[35] The ICE officer allowed Mr. Sied to make a phone call, and Mr. Sied called a friend and asked his friend to find him a lawyer.[36]

Over the Thanksgiving holiday, Mr. Sied's friend was able to get in touch with pro bono counsel.[37] On Friday, November 24 — the day after Thanksgiving — counsel spoke with an ICE officer, who informed counsel that the government had scheduled Mr. Sied for imminent deportation to Eritrea and that the transfer could take place as early as the following Monday, November 27.[38] On November 27, counsel learned from Mr. Sied's friend that ICE appeared to be preparing to deport Mr. Sied that day.[39]

**6. Over Thanksgiving, Mr. Sied Obtained Pro Bono Counsel, Who Filed an Emergency Habeas Petition and Sought an Injunction to Stay the Government from Deporting Mr. Sied to Eritrea While He Attempted to Reopen His Immigration Case**

Counsel intended to file a motion to reopen Mr. Sied's immigration case before his original IJ.[40] But counsel was unable to file a fully developed motion to reopen over the Thanksgiving holiday, when they were first retained, before the following Monday when the government planned to deport Mr. Sied to Eritrea.[41] Among other things, counsel did not have a copy of Mr.

---

[34] Sied Decl. – ECF No. 3 at 5.

[35] *Id.*

[36] *Id.*

[37] [First] Sclater Decl. – ECF No. 5 at 2 (¶ 7).

[38] *Id.* (¶¶ 2–3).

[39] *Id.* (¶¶ 4–6).

[40] *Id.* at 2–3 (¶ 7).

[41] *Id.*

Sied's record of proceedings ("ROP") from his original immigration case or his "A-file" (the comprehensive immigration file maintained by the Department of Homeland Security for each alien), which they needed to review in order to file a competent motion to reopen before the IJ.[42]

Because the government planned to deport Mr. Sied to Eritrea before counsel could file a motion to reopen before an IJ, on Monday, November 27, counsel filed a petition for a writ of habeas corpus in the Northern District of California and filed a motion for an emergency temporary restraining order (TRO) and for a preliminary injunction enjoining the government from deporting Mr. Sied from the United States (or transferring him out of the Northern District of California) until the court could resolve the merits of his habeas petition.[43]

The court held an emergency hearing that day and granted Mr. Sied's motion for a TRO.[44] The court ordered briefing on Mr. Sied's motion for a preliminary injunction and scheduled an initial hearing for December 11. Following the December 11 hearing, the court asked for additional briefing and continued the hearing to February 8, 2018. (Due to subsequent scheduling conflicts with the court and the parties, the hearing was continued to March 1.)

### 7. The Government Maintains That Under 8 U.S.C. § 1252(a)(5), (b)(9), (d)(1), and (g), This Court Has No Jurisdiction to Hear Mr. Sied's Habeas Petition, and That Mr. Sied Should Instead File a Motion to Reopen Before an Immigration Judge

In its briefing and at the December 11 and March 1 hearings, the government argued that the court lacks jurisdiction over Mr. Sied's habeas petition and therefore cannot grant him any relief.

Broadly stated, the government's position is this: Congress enacted certain statutes — 8 U.S.C. § 1252(a)(5), (b)(9), (d)(1), and (g) — that divested federal district courts of jurisdiction over habeas petitions brought by aliens in removal proceedings.[45] The government argues that Congress

---

[42] *Id.*; *see also* Realmuto Decl. – ECF No. 21-5 at 5–6 (¶¶ 9–10) (discussing importance of having ROP and A-file in filing a motion to reopen).

[43] Pet. for Writ of Habeas Corpus – ECF No. 1; Pet'r Mot. for TRO and Prelim. Injunction – ECF No. 2.

[44] Order Granting Pet'r Mot. for TRO – ECF No. 11.

[45] Resp'ts Opp'n – ECF No. 30 at 10.

intended to funnel all claims challenging an order to remove an alien from the United States, or the government's decision to execute that order, through an administrative process before IJs and the BIA, and then up to the federal courts of appeals, and enacted Sections 1252(a)(5), (b)(9), (d)(1), and (g) to prevent aliens from bringing challenges in district courts instead of pursuing the statutory IJ/BIA/court-of-appeals process.[46] The government maintains that this means that Mr. Sied can file a motion to reopen his immigration case before an IJ, but he cannot bring a habeas petition before this court.[47]

### 8. Mr. Sied Wants to Pursue the Motion-to-Reopen Process Before an Immigration Judge, but He Brings This Habeas Petition Because He Fears That the Government Will Deport Him Before His Motion Can Be Heard

Mr. Sied, for his part, agrees that he can challenge his underlying removal order only through a motion to reopen his immigration case before the IJ who entered the original order in May 2016. On February 26, 2018, Mr. Sied filed a motion to reopen before the IJ.[48] He wants to pursue the motion-to-reopen process and is not challenging his removal order in this case.[49]

Instead, in his habeas petition, Mr. Sied challenges an alleged due-process violation.[50] He fears that the government will deport him before the IJ can hear his motion to reopen. Mr. Sied argues that if the government deports him, he may face detention, interrogation, torture, and death in Eritrea.[51] This would effectively deprive him of his due-process right to have his motion to reopen

---

[46] *Id.*

[47] *Id.* ("[Mr. Sied] therefore must bring his claims first in the immigration courts and the BIA through a motion to reopen, and if unsuccessful, in the appropriate federal court of appeals through a petition for review.") (citations omitted).

[48] Notice re Filing of Mot. to Reopen – ECF No. 39.

[49] Pet. for Writ of Habeas Corpus – ECF No. 1 at 4 (¶ 11), 8–9 (¶ 26); Pet'r Opening Br. – ECF No. 28 at 13.

[50] Pet. for Writ of Habeas Corpus – ECF No. 1 at 8–9 (¶¶ 25–28).

[51] *Id.* at 6–7 (¶ 22). The government acknowledges that it has no information about the current country conditions in Eritrea and cannot state that Mr. Sied would be safe there. Mar. 1, 2018 Hr'g.

heard, because the motion becomes moot if he is deported to Eritrea and is detained or dead by the time the motion is decided.[52]

### 9. An Alien Subject to Removal Has a Statutory Right to File a Motion to Reopen Before an IJ or the BIA

"An alien ordered to leave the country has a statutory right to file a motion to reopen his removal proceedings." *Mata v. Lynch*, 135 S. Ct. 2150, 2153 (2015) (citing 8 U.S.C. § 1229a(c)(7)(A)). The motion must be based on material new facts that could not have been discovered or presented at his former hearing. 8 U.S.C. § 1229a(c)(7) ("An alien may file one motion to reopen proceedings under this section . . . . The motion to reopen shall state the new facts that will be proven at a hearing to be held if the motion is granted, and shall be supported by affidavits or other evidentiary material."); 8 C.F.R. § 1003.23(b)(3) ("A motion to reopen will not be granted unless the Immigration Judge is satisfied that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing."). The Supreme Court has characterized this right to move to reopen as "an 'important safeguard' intended 'to ensure a proper and lawful disposition' of immigration proceedings." *Kucana v. Holder*, 558 U.S. 223, 242 (2010) (quoting *Dada v. Mukasey*, 554 U.S. 1, 18 (2008)).

If a motion to reopen is granted, the alien's original removal order is vacated — "that is, it is as if it never occurred." *Bonilla v. Lynch*, 840 F.3d 575, 589 (9th Cir. 2016) (citing *Nken v. Holder*, 556 U.S. 418, 429 n.1 (2009)). Consequently, the alien is not removable while his now-reopened case is pending and has the opportunity to be heard on the merits of his underlying asylum or withholding-of-removal claim.

Where, as here, an IJ enters an alien's original order of removal and the alien did not appeal, the alien may bring a motion to reopen before the IJ. 8 C.F.R. § 1003.23(b)(1). If the IJ denies the alien's motion to reopen, the alien may appeal the IJ's decision to the BIA. 8 C.F.R. §§ 1003.1(b)(3), 1003.38(a). If the BIA then denies the alien's motion to reopen, the alien may file

---

[52] *See id.* at 6–9 (¶¶ 22–26).

a petition for judicial review by a federal court of appeals. *Mata*, 135 S. Ct. at 2153 (citing *Kucana*, 558 U.S. at 242, 253).

Where, as here, the alien is seeking asylum or withholding of removal based on changed country conditions, there is no time limit for filing the alien's one statutory motion to reopen. 8 U.S.C. § 1229a(c)(7)(C)(ii).

**10. There Are Limited Procedural Protections in the Administrative Motion-to-Reopen Process to Prevent the Government From Deporting an Alien from the United States While the Process Is Pending**

The filing of a motion to reopen does not prevent the government from removing the alien from the United States while the motion is pending. 8 C.F.R. §§ 1003.2(f), 1003.23(b)(4)(i).

In connection with a motion to reopen, an alien can ask that the IJ or the BIA, as applicable, grant a stay of removal pending disposition of the motion to reopen. 8 C.F.R. § 1003.2(f), 1003.23(b)(4)(i); *see* U.S. Dep't of Justice, Immigration Court Practice Manual § 8.3 (Nov. 2, 2017), *available at* https://www.justice.gov/sites/default/files/pages/attachments/2017/11/02/practicemanual.pdf (last visited Mar. 2, 2018) ("IC Manual"); U.S. Dep't of Justice, Board of Immigration Appeals Practice Manual §§ 6.3–6.4 (Feb. 3, 2017), *available at* https://www.justice.gov/sites/default/files/pages/attachments/2017/02/03/biapracticemanualfy2017.pdf (last visited Mar. 2, 2018) ("BIA Manual").

Filing a motion for a stay of removal does not prevent the government from removing the alien from the United States while the stay motion is pending. *See* IC Manual § 8.3(c) ("The mere filing of a motion for a discretionary stay of a[ removal] order does not prevent execution of the order. Therefore, the order may be executed unless and until the motion is granted."); BIA Manual § 6.3(c) (same re BIA). This leads to scenarios where an alien can be deported before his motion to reopen is heard and decided, including (1) the time before the IJ rules on a stay motion, (2) if the IJ denies a stay motion and the alien appeals to the BIA, the time before the BIA exercises jurisdiction and rules on a stay motion, and (3) if the BIA denies a stay motion and the alien petitions a federal court of appeals for review, the time before the court of appeals exercises jurisdiction and rules on a stay motion.

### 10.1 There Is No Mechanism to Prevent the Government from Deporting an Alien When the Alien Moves an IJ to Stay Deportation But the IJ Has Not Ruled on That Motion

If the IJ grants a motion to stay removal, the alien will not be deported while the IJ considers the motion to reopen. 8 C.F.R. § 1003.23(b)(4)(i). But there is no procedure or automatic mechanism to prevent the government from deporting the alien before the IJ decides the stay motion.

The government has submitted a declaration from the Honorable Elisa M. Sukkar, Assistant Chief Immigration Judge for the Executive Office of Immigration Review. Judge Sukkar estimates based on her experience that IJs at the Krome Immigration Court in Miami (the venue of Mr. Sied's original removal proceedings) generally rule on emergency requests for stays of removal within twenty-four hours of receiving them.[53] But this declaration does not necessarily establish that an alien like Mr. Sied would have a meaningful opportunity to be heard on a motion to reopen, or that the government would not deport him before his motion to reopen is heard.

First, filing a motion to stay deportation is not the equivalent of receipt of the motion by the IJ. Unlike in federal court, parties cannot file motions with an IJ electronically. IC Manual § 3.1(a)(viii) ("All other filings [other than a notice of entry of appearance] must be submitted as paper submissions to the Immigration Court."). And after a paper motion is filed, it is first reviewed by the immigration-court staff, who check jurisdiction, enter information about the motion into the court's case-management system, contact ICE and inform ICE that the alien has filed a request for a stay, and retrieve other records associated with the alien; only then does the motion make its way to the IJ.[54] The record does not establish how long that process takes — but it is not instantaneous, and absent any other order staying deportation, there is no mechanism to prevent the government from deporting the alien while the immigration-court staff process his motion to stay deportation. (Delays along these lines have occurred in Mr. Sied's case: Mr. Sied filed his motion to reopen and his motion for a stay with the immigration court on February 26,

---

[53] Sukkar Decl. – ECF No. 38 at 5 (¶ 21).

[54] *See id.* at 4–5 (¶¶ 14–18).

2018, but as of the March 1 hearing, not only has the IJ not ruled on the motion, the IJ may not have received it.[55]) This can raise due-process concerns.[56]

Second, an IJ's receipt of a motion to stay deportation is not necessarily the equivalent of a ruling on the motion. And until the IJ rules, there is no mechanism to prevent the government from deporting the alien while his motion to stay deportation is pending. If the government deports the alien to a country where he may be tortured or murdered, even if the IJ then grants the stay motion and/or the underlying motion to reopen, relief may come too late.

### 10.2 There Is No Mechanism to Prevent the Government from Deporting an Alien Where the IJ Denies the Alien's Motion to Stay Deportation but Has Not Ruled on the Underlying Motion to Reopen

As noted above, if the IJ grants the alien's underlying motion to reopen, the alien's original removal order is vacated. *Bonilla*, 840 F.3d at 589. Conversely, if the IJ denies the alien's motion to reopen, the alien can appeal the decision to the BIA. 8 C.F.R. §§ 1003.1(b)(3), 1003.38(a). But if the IJ denies only the stay motion and does not simultaneously rule on the motion to reopen, the alien is potentially in limbo, with no way to prevent deportation no matter how meritorious his underlying motion to reopen.

Were an analogous situation to arise in federal court and were a federal district court to deny an analogous stay motion, the applicant could appeal to the court of appeals. 28 U.S.C. § 1292(a)(1). The purpose of the rule that allows litigants in federal court to appeal denials of preliminary injunctions is so that they can "effectively challenge interlocutory orders of serious, perhaps irreparable, consequence." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981) (citing *Baltimore Contractors, Inc. v. Bodinger*, 348 U.S. 176, 181 (1955)). There apparently is no analogous right to appeal an IJ's denial of a stay motion. The BIA appears to decline to consider

---

[55] At the March 1 hearing, the government stated that the IJ had not received Mr. Sied's motion and has not had an opportunity to review it but was aware that it was incoming.

[56] In a holding about the BIA that would apply as well to immigration courts, the Ninth Circuit cautioned that delays in processing motions and filings that prevent an alien from being heard can constitute a due-process violation. *Irigoyen-Briones v. Holder*, 644 F.3d 943, 949 (9th Cir. 2011) (delays by immigration offices in filing motions after receipt that deprive alien of "an opportunity to be heard . . . 'at a meaningful time and in a meaningful manner'" may violate due process) (citing *Gonzalez-Julio v. INS*, 34 F.3d 820, 823 (9th Cir. 1994)).

such appeals, leaving aliens with no avenue for relief. *See, e.g.*, *In re Villatoro-Avila*, No. A090 968 520, 2013 WL 1933533 (B.I.A. Mar. 20, 2013) (declining to hear alien's motion to appeal IJ's denial of stay); *In re Rahman*, No. A076 492 135, 2009 WL 3063802 (B.I.A. Sept. 17, 2009) (same).

The Supreme Court has indicated that it may be an abuse of discretion to deny a stay if an alien has presented non-frivolous grounds for reopening his case. *Dada*, 554 U.S. at 21 (holding with respect to motions to stay before the BIA, that "though the BIA has discretion to deny the motion for a stay, it may constitute an abuse of discretion for the BIA to do so where the [alien's] motion states nonfrivolous grounds for reopening"). But if the IJ denies the alien's request for a stay without simultaneously deciding the underlying motion to reopen, the alien may be left with no way to challenge the IJ's stay decision — no matter how much of an abuse of discretion it might have been — or to prevent his deportation. If the government then deports the alien to a country where he may be subject to persecution or torture, the alien may never have the opportunity to be heard on his underlying motion to reopen.

### 10.3 There Is No Mechanism to Prevent the Government from Deporting an Alien When the Alien Moves the BIA to Stay Deportation but the BIA Has Not Ruled on That Motion, or Where the BIA Denies the Alien's Motion to Stay Deportation but Has Not Ruled on the Underlying Motion to Reopen

The same considerations are present if the IJ denies the alien's underlying motion to reopen, and the alien appeals that final decision to the BIA. As with a proceeding before the IJ, an appeal to the BIA does not automatically stop deportation, and the alien must therefore separately submit a motion for a stay. If the BIA grants the underlying motion to reopen, the alien's original removal order is vacated. *Bonilla*, 840 F.3d at 589. Conversely, if the BIA denies the underlying motion to reopen, the alien can petition a federal court of appeals for judicial review. *Mata*, 135 S. Ct. at 2154. But where the BIA has not ruled on the underlying motion to reopen, and if the BIA either denies the alien's stay motion or does not rule on it at all, the alien is once again left in limbo, potentially subject to deportation without any way to challenge the BIA's inaction or denial of his request for a stay. *See Shaboyan v. Holder*, 652 F.3d 988, 990–91 (9th Cir. 2011) (holding that a BIA order denying a stay is only an "interim order" and hence the court of appeals lacks

jurisdiction to review it).[57] Once again, if the government then deports the alien to a country where he may be subject to persecution or torture, the alien may never have the opportunity to be heard on his underlying motion to reopen; by the time the BIA issues its order on the motion to reopen, the alien might be tortured or dead.

### 11. The Government Concedes That If It Deports Mr. Sied to Eritrea, Mr. Sied Will Be Denied the Opportunity to Pursue the Motion-to-Reopen Process

In some cases, aliens can present their motions to reopen even if they are removed from the United States while their motions are pending.[58] Here, however, the government concedes that Mr. Sied would not be able to pursue his motion to reopen if he were removed to Eritrea.[59]

The U.S. State Department's most recent country report on Eritrea states, "[t]he [Eritrean] government reportedly committed arbitrary killings with impunity and subjected detainees to harsh and life-threatening prison conditions. Prisoners who disappeared were often presumed dead. . . . Security forces tortured and beat . . . persons attempting to flee the country without travel documents, and  members of certain religious groups."[60] The *Washington Post* similarly has reported that Eritrea "has a long track record of jailing and torturing people who attempted to flee

---

[57] The government cites *Khan v. Attorney General of the United States*, 691 F.3d 488 (3d Cir. 2012), to suggest that an alien whose request for a stay is denied by the BIA can petition a court of appeals for a stay. *Khan*, however, did not decide whether the BIA's denial of a stay is appealable to the court of appeals when the BIA has not issued a final order on the alien's underlying motion to reopen. In *Khan*, the alien petitioned the Third Circuit for a stay before the BIA ruled on his underlying motion to reopen. *Id.* at 492. The government moved to dismiss the petition, arguing that the Third Circuit lacked jurisdiction over the alien's case until the BIA ruled on the underlying motion to reopen. *Id.* Two weeks after the alien filed his petition for a stay with the Third Circuit, the BIA ruled on the underlying motion to reopen. The Third Circuit then exercised jurisdiction over the alien's entire case, including his request for a stay, because the BIA had issued a final order. *Id.* at 493–94. This decision provides no guarantees that an alien will not be left in limbo if, unlike in *Khan*, the BIA denies a request for a stay and then does not issue a decision on the underlying motion to reopen soon thereafter.

[58] *See, e.g.*, *Coyt v. Holder*, 593 F.3d 902 (9th Cir. 2010) (involving alien who was removed to Mexico who continued to pursue his motion to reopen his immigration case from there).

[59] Dec. 11, 2017 Hr'g Tr. – ECF No. 27 at 30.

[60] U.S. Dep't of State, *Eritrea 2016 Human Rights Report* 2–3 (2016), *available at* https://www.state. gov/documents/organization/265464.pdf (last visited Mar. 2, 2018).

the country."[61] As someone who fled the country, Mr. Sied may be subject to detention and torture if he were deported back to Eritrea.

Even assuming Mr. Sied were not formally detained by the Eritrean government, he apparently would not be able to communicate with counsel and meaningfully pursue a motion to reopen if he were deported. As Senior Research Fellow Martin Plaut attested:

> This recent escalation of arbitrary arrest and detention of Akriya residents by the Eritrean government puts anyone living there at risk. In particular, a Jeberti Muslim, born and raised in Akriya, such as Petitioner Abdul Sied, who also has a history of political protest and persecution in Eritrea, would very likely to be in grave danger if he were forcibly returned to Eritrea by the United States. Moreover, even if Petitioner Sied were not immediately arrested and detained upon his return to Eritrea, it would be virtually impossible for him to litigate his claims for relief in the U.S. immigration system from there, due [to] the extreme isolation and lack of infrastructure and resources, including access to the Internet, as well as lack of access to counsel.[62]

## 12. The Government Refuses to Agree or Provide Any Assurance That It Will Not Deport Mr. Sied to Eritrea While the Motion-to-Reopen Process Is Pending

On February 20, 2018, the court asked the government to provide its position on the following questions:

> 1. If Mr. Sied files a motion to reopen his immigration case and requests a stay of removal from an immigration judge, is the government willing to agree to not remove Mr. Sied from the United States before the immigration judge rules on his stay request?

> 2. If the immigration judge denies Mr. Sied's stay request and Mr. Sied notifies the government that he wants to request a stay of removal from the Board of Immigration Appeals ("BIA"), is the government willing to agree to not remove Mr. Sied from the United States before Mr. Sied is able to submit a stay request to the BIA and the BIA has jurisdiction over, and rules on, his stay request?

> 3. If the BIA denies Mr. Sied's stay request and Mr. Sied notifies the government that he wants to request a stay of removal from a federal court of appeals ("COA"), is the government willing to agree to not remove Mr. Sied from the United States before Mr. Sied is able to submit a stay request to a COA and the COA has jurisdiction over, and rules on, his stay request?[63]

---

[61] Kevin Sieff, *The U.S. Wants to Deport More Eritreans. Here's What Would Happen If They Were Forced to Return*, Wash. Post, Aug. 24, 2017 (attached as [Third] Rocca Decl. Ex. D – ECF No. 21-2 at 24–27).

[62] Plaut Decl. – ECF No. 21-4 at 3 (¶ 6).

[63] Order – ECF No. 37.

The government responded:

> The Government is not willing to stay the execution of Mr. Sied's final order of removal before an immigration judge rules on any emergency stay motion he may file.

> The Government is not willing to stay the execution of Mr. Sied's final order of removal before the BIA rules on any emergency stay motion he may file.

> The Government is not willing to stay the execution of Mr. Sied's final order of removal before the appropriate court of appeals rules on any emergency stay motion he may file.[64]

## JURISDICTIONAL ANALYSIS

The government argues that four subsections of 8 U.S.C. § 1252 — 8 U.S.C § 1252(a)(5), (b)(9), (d)(1), and (g) — divest this court of jurisdiction to hear Mr. Sied's petition.[65]

As the Supreme Court and the Ninth Circuit have advised, courts "should narrowly construe restrictions on jurisdiction." *Montero-Martinez v. Ashcroft*, 277 F.3d 1137, 1141 (9th Cir. 2002) (citing *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482–83 (1999)). For the reasons described below, the court holds that it has jurisdiction to hear Mr. Sied's petition and that Sections 1252(a)(5), (b)(9), (d)(1), and (g) do not divest it of jurisdiction.

### 1. Sections 1252(a)(5) and (b)(9) Do Not Divest This Court of Jurisdiction over Mr. Sied's Petition

Section 1252(a)(5) provides, in relevant part:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter, except as provided in subsection (e).

---

[64] Resp'ts Resp. to Order – ECF No. 40 at 2.

[65] *See* Resp'ts Opp'n – ECF No. 30 at 7.

Section 1252(b)(9) provides, in relevant part:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.

These statutes were enacted in their current form in the REAL ID Act of 2005. Pub. L. No. 109-13 div. B, 119 Stat. 231, 302–23 (2005). As the Ninth Circuit has held, "determining when the REAL ID Act preempts habeas jurisdiction requires a case-by-case inquiry turning on a practical analysis, and . . . there are many circumstances in which an alien subject to an order of a removal can properly challenge his immigration detention in a habeas petition without unduly implicating the order of removal." *Singh v. Holder*, 638 F.3d 1196, 1211 (9th Cir. 2011) (*Vijendra Singh*) (citing cases).

## 1.1 Sections 1252(a)(5) and (b)(9) Do Not Apply to a Habeas Petition That Is Not a "Direct Challenge to an Order of Removal"

The seminal Ninth Circuit opinion interpreting Sections 1252(a)(5) and (b)(9) is *Singh v. Gonzales*, 499 F.3d 969 (9th Cir. 2007) (*Amarjeet Singh*). The Ninth Circuit held there that "Section 1252(a)(5) is prominently directed to 'judicial review of an order of removal.'" *Id.* at 978. The Ninth Circuit similarly held that Section 1252(b)(9), which covers only "an action taken or proceeding brought to remove an alien," "applies '*only* with respect to review of an *order of removal* under 8 U.S.C. § 1252(a)(1).'" *Id.* (emphasis in original, internal brackets omitted) (quoting *INS v. St. Cyr*, 533 U.S. 289, 313 (2001)). Based on the statutory language, legislative history, and applicable precedent, the Ninth Circuit held that Sections 1252(a)(5)'s and (b)(9)'s "jurisdiction-stripping provisions do[] not apply if the claim is *not a direct challenge to an order of removal*." *Id.* (emphasis in original, internal brackets and ellipsis omitted) (quoting *Puri v. Gonzales*, 464 F.3d 1038, 1041 (9th Cir. 2006) and citing other cases and legislative history).[66]

---

[66] The Ninth Circuit held that Sections 1252(a)(5) and (b)(9) were meant to mirror each other: Section 1252(a)(5) divests district courts of jurisdiction over direct challenges to orders of removal, and Section 1252(b)(9) directs and consolidates all such challenges "into one action in the court of appeals." *Id.* at 978 & n.11 (citing *St. Cyr*, 533 U.S. at 313).

A majority of the Supreme Court recently confirmed that Section 1252(b)(9) does not apply and does not divest courts of jurisdiction where "[aliens] are not asking for a review of an order of removal; they are not challenging the decision to detain them in the first place or to seek removal; and they are not . . . challenging any part of the process by which their removability will be determined." *Jennings v. Rodriguez*, 583 U.S. __, No. 15-1204, 2018 WL 1054878, at *8 (Feb. 27, 2018) (plurality opinion); *see also id.* at *44 (Breyer, J., dissenting) ("8 U.S.C. § 1252(b)(9), . . . by its terms applies only with respect to review of an order of removal") (internal quotation marks and brackets omitted).

In sum, if a habeas petition is not a direct challenge to an order of removal, nothing in Section 1252(a)(5) or (b)(9) prevents a district court from exercising jurisdiction to hear the petition.

### 1.1.1 Habeas petitions are not direct challenges to a removal order where (1) the grounds for the petition arose after the removal order was entered and (2) the relief sought is only "a day in court" at a subsequent proceeding

In *Amarjeet Singh*, the Ninth Circuit identified a category of habeas petitions that are not direct challenges to an order of removal: habeas petitions brought when (1) the grounds for the petition arose only after the removal order was entered, and (2) the relief sought by the petition is only to have a "day in court," i.e., to be heard, at a subsequent proceeding challenging the underlying removal order (as opposed to a habeas petition that itself directly challenges the merits of the removal order). *Amarjeet Singh*, 499 F.3d at 979.

The petitioner in that case was an Indian citizen who applied in the United States for asylum and withholding of removal. *Id.* at 972. The IJ denied asylum and withholding, and the BIA affirmed the IJ and issued a final order of removal. *Id.* at 972–73. One of Mr. Singh's lawyers (identified as "Lawyer 2" in the opinion) filed a petition for review before the Ninth Circuit, but the lawyer's filing was untimely, and the Ninth Circuit denied it on that basis. *Id.* at 973. Mr. Singh then filed a habeas petition in federal district court in the Northern District of California, alleging (among other things) that he was denied due process because his lawyer, in missing his filing deadlines, provided ineffective assistance of counsel. *Id.* at 974. The district court dismissed Mr. Singh's habeas petition, holding that Sections 1252(a)(5) and (b)(9) divested it of jurisdiction to consider the petition. *Id.* at 974. Mr. Singh appealed to the Ninth Circuit.

The Ninth Circuit first observed that Mr. Singh was not challenging his underlying removal order that was entered by the IJ and BIA. Instead, he was challenging events that occurred only after his removal order had been entered — namely, his lawyer's failure to appeal that order after it became final. *Id.* at 979 ("At the time Lawyer 2 filed the late petition for review before this court, the removal order against Singh had become final. The alleged ineffective assistance of Lawyer 2 occurred *after* the issuance of the final order of removal[.]") (emphasis in original). The Ninth Circuit then observed that "the claimed injury that Singh suffered as a result was the deprivation of an opportunity for direct review of the order of removal in the court of appeals," and "a successful habeas petition in this case will lead to nothing more than 'a day in court'" for Mr. Singh. *Id.* Relief on Mr. Singh's habeas petition would not result in a vacatur or modification of his underlying removal order. *Id.* The Ninth Circuit held that these facts established that Mr. Singh's petition "cannot be construed as seeking judicial review of his final order of removal" and hence was not barred by Section 1252(a)(5) or (b)(9). *Id.*

Mr. Singh's ultimate goal, of course, was "to overturn that final order of removal" — but that did not govern how a court should evaluate his habeas petition, because the habeas petition did not challenge his order of removal. *Id.* Granting his habeas petition would not affect his underlying removal order or call that order into question. It would afford him only the opportunity to petition the Ninth Circuit — in a separate and subsequent proceeding — to review his removal order. It is that separate and subsequent proceeding — not the preliminary habeas petition requesting that subsequent proceeding — that would involve the "judicial review of an order of removal" at issue in Sections 1252(a)(5) and (b)(9).[67]

The two elements that the Ninth Circuit identified in *Amarjeet Singh* — (1) the grounds for the petition arose only after the removal order was entered, and (2) the relief sought by the petition is only to have a "day in court" to be heard on a subsequent challenge to the removal order, not a

---

[67] And of course, the Ninth Circuit could grant Mr. Singh's preliminary habeas petition and then reject Mr. Singh's subsequent merits petition — further confirming that the preliminary habeas petition is not a challenge to the removal order, because there is nothing inconsistent about granting the habeas petition while also affirming the removal order and holding it correctly decided in all respects.

challenge on the merits to the removal order itself — are both present in Mr. Sied's petition. First, the grounds for Mr. Sied's petition are the changed circumstances in Eritrea beginning with the demonstration in October 2017 and the government crackdown thereafter, which arose after Mr. Sied's May 2016 removal order. Second, Mr. Sied seeks only a "day in court" on his motion to reopen. He does not ask this court to review his May 2016 removal order or address whether Eritrea's country conditions have in fact changed, or whether he should in fact be afforded asylum or withholding of removal. He asks only for the opportunity to make those arguments before the IJ (and, if necessary, the BIA and a court of appeals) without the government's deporting him before he is heard. Mr. Sied's petition meets the elements set out in *Amarjeet Singh* and is not a direct challenge to a removal order. Sections 1252(a)(5) and (b)(9) do not divest this court of jurisdiction.

### 1.1.2 Habeas petitions are not direct challenges to a removal order where they request only a stay of removal in connection with a motion to reopen based on changed country conditions

In addition to habeas petitions that meet the two-part test in *Amarjeet Singh*, other Ninth Circuit precedents have identified another category of habeas petitions that are not direct challenges to an order of removal: habeas petitions requesting a stay of removal in connection with a motion to reopen based on changed country conditions. Sections 1252(a)(5) and (b)(9) do not divest district courts of jurisdiction to hear such petitions.

First, a motion to reopen based on changed country conditions is not a direct challenge to an order of removal. As the Ninth Circuit and other courts have held, "a court may not directly review the original denial of asylum [or withholding of removal] on a motion to reopen." *Toufighi v. Mukasey*, 538 F.3d 988, 995 n.13 (9th Cir. 2008) (citing *Bhasin v. Gonzales*, 423 F.3d 977, 986 n.3 (9th Cir. 2005)); *accord, e.g.*, *Sanchez v. Keisler*, 505 F.3d 641, 647 (7th Cir. 2007) ("[m]otions to reopen . . . do not challenge the correctness of an earlier decision based on the existing record") (quoting *Mungongo v. Gonzales*, 479 F.3d 531, 534 (7th Cir. 2007)); *see also, e.g.*, *Cobos-Luna v. Boente*, 678 F. App'x 498, 499–500 (9th Cir. 2017) (distinguishing between a "motion to reopen the original removal order," on the one hand, and a request for "review . . . of

the original removal order," on the other) (citing *Lin v. Gonzales*, 473 F.3d 979, 981 n.1 (9th Cir. 2007)).

Second, a request for a stay of removal is not a direct challenge to the underlying order of removal. As the Ninth Circuit has held, "[e]ven if [an alien] were granted the stay of removal, the order granting that stay would not attack the validity of the underlying removal order. 'The granting of a stay pending . . . consideration of the motion to reopen d[oes] not attack the deportation order itself, nor [i]s it a determination on which the final order of deportation [i]s contingent.'" *Shaboyan*, 652 F.3d at 990 (quoting *Dhangu v. INS*, 812 F.2d 455, 459 (9th Cir. 1987)).

Because a motion to reopen based on changed country conditions is not a direct challenge to a removal order, and a request for a stay of removal is not a direct challenge to a removal order, it follows that a habeas petition for a stay of removal to allow a hearing on a motion to reopen based on changed country conditions is not a direct challenge to a removal order either. Sections 1252(a)(5)'s and (b)(9)'s jurisdiction-stripping provisions — which apply only to habeas petitions that seek "judicial review of an order of removal," *Amarjeet Singh*, 499 F.3d at 978 — do not apply and do not divest a district court of jurisdiction to hear such a petition.

Mr. Sied's petition is a habeas petition requesting a stay of removal so that he can be heard on his motion to reopen based on changed country conditions. Under *Toufighi* and *Shaboyan*, Mr. Sied's petition is not a direct challenge to his underlying order of removal. Consequently, Sections 1252(a)(5) and (b)(9) do not divest the court of jurisdiction to hear his petition.

### 1.1.3 Recent district-court decisions in this circuit confirm that when the government threatens to remove aliens before they can be heard on motions to reopen, a district court has jurisdiction to hear a habeas petition requesting a stay of removal

Two district courts in this circuit have confronted the question raised here: when aliens have a statutory right to file a motion to reopen their immigration proceedings, but the government threatens to remove the aliens from the United States before their motions can be heard, does a district court have jurisdiction to hear a habeas petition from the aliens requesting a stay of removal? Both have answered yes.

In *Chhoeun v. Marin*, No. SACV 17-01898-CJC(GJSx), 2018 WL 566821 (C.D. Cal. Jan. 25, 2018), ICE seized 92 Cambodian citizens without warning; they potentially faced immediate deportation. *Id.* at *1. The aliens sought to file motions to reopen their immigration cases before IJs or the BIA. *Id.* at *1, *6. The government threatened to deport them before their motions to reopen could be filed and heard. *Id.* at *1 ("ICE still has not afforded Petitioners an adequate opportunity to challenge their current detention or the underlying orders of removal. Instead, ICE continues to detain most of them and plans to deport most of them to Cambodia at any time."). The petitioners filed habeas petitions in district court, asking to stay deportation so that their motions to reopen could be heard. The government opposed, arguing that Sections 1252(a)(5) and (b)(9) divested the district court of jurisdiction to hear the petitions. The district court rejected the government's argument and affirmed that it had jurisdiction, holding:

> The Ninth Circuit has, on a number of occasions, construed the provisions cited by the Government and has consistently held that district courts have jurisdiction when, as in this case, petitioners do not directly challenge their orders of removal, but rather assert a due process right to challenge the orders in the appropriate court. . . . Petitioners do not seek review of the viability of their removal orders in the district court. In other words, Petitioners do not directly challenge the bases for their orders of removal. Instead, Petitioners seek an opportunity to challenge the removal orders. Petitioners merely request that their deportations be delayed until they can file motions to reopen and until they can avail themselves of the administrative system that exists to litigate meritorious motions to reopen. The relief Petitioners request will not entitle them to any substantive benefits; it is limited to "a day in court" to comport with due process.

*Id.* at *9 (exercising jurisdiction over habeas petitions and issuing preliminary injunction staying removals) (citing *Amarjeet Singh*, 499 F.3d at 979).

Similarly, in *Gbotoe v. Jennings*, No. C 17-06819 WHA, 2017 WL 6039713 (N.D. Cal. Dec. 6, 2017), *appeal docketed*, No. 18-15181 (9th Cir. Feb. 5, 2018), a Liberian citizen subject to an order of removal filed motions to reopen his immigration case and motions to stay removal, first before an IJ and then before the BIA. *Id.* at *1–2. The BIA denied his motion for a stay, without ruling on his motion to reopen. *Id.* at *2. The day after the BIA denied his stay, the government informed Mr. Gbotoe that they would deport him that evening (without waiting for the BIA to hear and rule on his still-pending motion to reopen). *Id.* Mr. Gbotoe filed a habeas petition in district court and requested a stay of removal. *Id.* The government opposed, arguing that Sections

1252(a)(5) and (b)(9) divested the district court of jurisdiction. The court rejected the

government's argument, holding that "[i]f Gbotoe's request for a stay is denied, he will be

removed from the United States before ever having the merits of his motion to reopen determined

by the BIA." *Id.* at *4. Given that "Gbotoe is seeking review of [changed country conditions] that

arose *after* a final removal decision, and a grant of relief will lead to nothing more than 'a day in

court . . . which is consistent with Congressional intent underlaying [sic] the REAL ID Act,'" the

court held that it had jurisdiction and that Sections 1252(a)(5) and (b)(9) did not apply. *Id.* at *4

(emphasis and ellipsis in original) (citing *Amarjeet Singh*, 499 F.3d at 979; *Shaboyan*, 652 F.3d at

990).

Mr. Sied's petition is no different than the petitions in *Chhoeun* and *Gbotoe*. The court follows

those decisions as persuasive. They confirm this court's reading of applicable Ninth Circuit

precedent, that Sections 1252(a)(5) and (b)(9) do not divest the court of jurisdiction over Mr.

Sied's habeas petition.

### 1.2 The Government's Arguments That Sections 1252(a)(5) and (b)(9) Divest This Court of Jurisdiction Fail

#### 1.2.1 The court disagrees that Mr. Sied's habeas petition and his motion to reopen are based on the same argument

The government's primary argument with respect to Sections 1252(a)(5) and (b)(9) is that an

alien's habeas petition must "stand alone" from his challenge to his underlying removal order for a

district court to have jurisdiction over the petition, citing *Vijendra Singh*, 638 F.3d at 1212.[68] The

government argues that "the basis of [Mr. Sied's] ostensible habeas claim is the same as the basis

of his eventual petition for review," and therefore the court lacks jurisdiction over the petition.[69]

This is incorrect.

The basis of Mr. Sied's habeas petition is not the same as the basis of his motion to reopen

before the IJ. The basis for the motion to reopen is that country conditions in Eritrea have changed

and that Mr. Sied faces persecution or torture there, and hence he is entitled to asylum or

---

[68] *See* Gov't Opp'n – ECF No. 30 at 15.

[69] *See id.*

withholding of removal. By contrast, the basis for Mr. Sied's habeas petition is not whether

country conditions in Eritrea have changed: it is whether the government denies him due process

by threatening to deport him before he can make his changed-country-conditions argument. These

two bases are not the same: it may be a due-process violation for the government to threaten to

remove him and prevent him from making his country-conditions argument, even if his underlying

changed-country-conditions argument is not a winning one. As discussed above, Sections

1252(a)(5) and (b)(9) do not divest the court of jurisdiction to address that due-process question.

*Cf. Vijendra Singh*, 638 F.3d at 1212 (holding that Section 1252(a)(5) divests district courts of

jurisdiction where an alien's "habeas challenge rests entirely on his assertion that he has presented

a meritorious argument in his petition for review," but not when the habeas challenge "could stand

alone").[70]

---

[70] Even if the basis for Mr. Sied's habeas petition were not independent from the basis of his motion to reopen, it is not clear whether that would strip this court of jurisdiction. The Ninth Circuit has held that even when the basis for an alien's habeas petition is "intertwined" with the merits of the his challenge to his removal proceedings, Section 1252(a)(5) and (b)(9) do not divest a district court of jurisdiction over the petition if the petition itself is not a direct challenge to an order of removal. *Flores-Torres v. Mukasey*, 548 F.3d 708, 711–12 & n.6 (9th Cir. 2008). *Flores-Torres* involved a petitioner in removal proceedings who claimed that he was a U.S. citizen. *Id.* at 709–10. Mr. Flores-Torres brought a habeas petition in district court. He did not challenge a final order of removal (no final order of removal had yet been entered against him) and instead challenged the government's authority to detain him while his removal proceedings were pending, on the ground that he was a U.S. citizen. *Id.* at 710. The Ninth Circuit recognized that the basis for Mr. Flores-Torres's habeas petition was inextricably "intertwined" with his underlying challenge to his removal proceedings: if he prevailed on his habeas argument that he was a U.S. citizen and hence could not be detained, he could not be removed either. *Id.* at 711–12. Despite this "intertwin[ing]," the Ninth Circuit held that Mr. Flores-Torres's habeas petition, which challenged detention, was not a direct challenge to an order of removal and hence Sections 1252(a)(5) and (b)(9) did not strip the district court of jurisdiction. *Id.* at 711–12 & n.6 (holding that the district court had jurisdiction because "Torres's habeas petition . . . does not challenge any final order of removal, but challenges his *detention* prior to the issuance of any such order") (emphasis in original).

In *Vijendra Singh*, the Ninth Circuit limited this "intertwin[ing]" holding. The petitioner in that case filed a habeas petition in district court, arguing that he was denied due process during a bail hearing before the IJ. *Vijendra Singh*, 638 F.3d at 1201. The Ninth Circuit held that the district court had jurisdiction to consider that argument. *Id.* at 1202. Mr. Singh also argued that "the district court should have 'looked to the underlying merits of [his] removal to determine if he has raised a substantial argument that he is unremovable' and therefore entitled to habeas relief." *Id.* at 1210 (internal brackets omitted). That argument, on its face, was a challenge to his underlying order of removal, and the Ninth Circuit held that Section 1252(a)(5) divested the district court to hear that argument. *Id.* at 1210–11. The Ninth Circuit wrote that Mr. Singh's "habeas petition [wa]s wholly intertwined with the merits of his removal order. . . . [and] does nothing more than attack the IJ's removal order," and the courts "lacked jurisdiction to review it other than on a petition for review." *Id.* at 1211 (citations and internal

*(cont'd)*

### 1.2.2 The government cites no binding authority that holds that Section 1252(a)(5) or (b)(9) divests this court of jurisdiction over Mr. Sied's habeas petition

As discussed above, binding authority — including *Amarjeet Singh*, *Toufighi*, and *Shaboyan* — compels the conclusion that Sections 1252(a)(5) and (b)(9) do not divest this court of jurisdiction over Mr. Sied's petition. The government does not cite any binding authority to the contrary that supports its conclusion that Section 1252(a)(5) or (b)(9) divest this court of jurisdiction.

The government primarily relies on *Iasu v. Smith*, 511 F.3d 881 (9th Cir. 2007). But that case is distinguishable. *Iasu* involved a petitioner who was subject to an order of removal and who subsequently filed a habeas petition claiming that he was a U.S. citizen. *Id.* at 884. During his initial immigration case before an IJ, Mr. Iasu did not challenge removal on the basis of claimed U.S. citizenship. *Id.* at 885. The IJ entered a final order of removal, and Mr. Iasu waived his right to appeal to the BIA. *Id.* Mr. Iasu did not seek to reopen his immigration proceedings or challenge the IJ's ruling before the IJ or the BIA. *Id.* at 884. Instead, Mr. Iasu brought a habeas petition in district court to directly challenge his removal, asserting for the first time that he was a U.S. citizen and hence the government could not remove him. *Id.* at 885. The Ninth Circuit held that this was a direct challenge to his removal order and that Section 1252(a)(5) thus stripped the district court of jurisdiction to hear his habeas petition. *Id.* at 887. The Ninth Circuit also held that Mr. Iasu could file a motion to reopen his immigration case with the IJ — and that a motion to reopen, and not a habeas petition, was the way for Mr. Iasu to raise his citizenship argument and challenge his order of removal. *Id.* at 892.

---

quotation marks omitted). The Ninth Circuit addressed *Flores-Torres* by holding that "in *Flores-Torres*, the [habeas] challenge could stand alone," whereas Mr. Singh's could not. *Id.* at 1212.

Given that Mr. Sied's habeas petition is not intertwined with the merits of his motion to reopen, the court need not parse precisely what amount and type of intertwining brings a habeas petition within the ambit of Sections 1252(a)(5) and (b)(9). It is sufficient to note that intertwining does not per se divest a court of jurisdiction and that, instead, "determining when the REAL ID Act preempts habeas jurisdiction requires a case-by-case inquiry turning on a practical analysis." *Vijendra Singh*, 638 F.3d at 1211; *accord Flores-Torres*, 548 F.3d 708, 711–12 & n.6.

1    *Iasu* does not change the outcome here. Mr. Iasu directly challenged the basis for his removal

2    order: he argued that he was a U.S. citizen and hence the government could not remove him. By

3    contrast, Mr. Sied does not directly challenge the basis for his removal order: he does not argue

4    that he should have been granted asylum or withholding from removal based on the country

5    conditions in Eritrea in 2016. Also, Mr. Iasu filed a habeas petition to directly challenge the IJ's

6    order of removal instead of filing a motion to reopen. The Ninth Circuit rejected that approach,

7    holding that Mr. Iasu could challenge his removal order only in a motion to reopen before the IJ,

8    not in a habeas petition. Mr. Sied, by contrast, has filed a motion to reopen before an IJ. He wants

9    to pursue the motion-to-reopen process, just as *Iasu* instructed he should. He filed this habeas

10   petition only to prevent the government's deporting him before his motion to reopen can be heard.

11   If the government were willing to promise not to deport Mr. Sied until he could have his motion to

12   reopen be heard, Mr. Sied would not have brought a habeas petition at all. This is different from

13   *Iasu*, which does not control here. And other than *Iasu*, the government cites no other Supreme

14   Court or Ninth Circuit cases where a court rejected a habeas petition for lack of jurisdiction under

15   Section 1252(a)(5) or (b)(9).[71]

---

[71] At the March 1 hearing, the government additionally cited the Supreme Court's recent decision in *Jennings v. Rodriguez*. But as noted above, that case does not support the government's contention that the court lacks jurisdiction over Mr. Sied's petition. A majority of the Supreme Court agreed that Section 1252(b)(9) does not divest courts of jurisdiction in cases where an alien is not asking for a review of an order of removal or the decision to detain him in the first place or to seek removal. *Jennings*, 583 U.S. at __, 2018 WL 1054878, at *8 (plurality opinion); *id.* at *44 (Breyer, J., dissenting). That case involved a challenge to the government's authority to hold aliens without bail, including a challenge to "the constitutionality of the entire statutory scheme under the Fifth Amendment." A Supreme Court majority held that the Court had jurisdiction. *See id.* at *7–9 (plurality opinion); *id.* at *44 (Breyer, J., dissenting). *Jennings* does not support the government's argument that Sections 1252(a)(5) and (b)(9) divest the court of jurisdiction over Mr. Sied's petition. To the contrary, the Supreme Court plurality cautioned against interpreting Section 1252(b)(9) in such a way as to "depriv[e] [a] detainee of any meaningful chance for judicial review." *Id.* at *8 (plurality opinion).

United States District Court
Northern District of California

### 1.2.3 The government cites no persuasive authority from a higher court that holds that Section 1252(a)(5) or (b)(9) divests this court of jurisdiction over Mr. Sied's habeas petition

The government cites several decisions from other courts of appeal. They do not support the government's contention that Section 1252(a)(5) or (b)(9) divest this court of jurisdiction over Mr. Sied's petition.

First, the government cites *Alexandre v. United States Attorney General*, 452 F.3d 1204 (11th Cir. 2006) and *Enwonwu v. Gonzales*, 438 F.3d 22 (1st Cir. 2006), but these decisions are inapposite. Both involved a special provision in the REAL ID Act that provided that habeas petitions pending when the REAL ID Act went into effect in 2005 would be transferred directly to a court of appeals (and hence would still be heard by a federal court). Pub. L. No. 109-13, § 106(c), 119 Stat. at 311; *see Alexandre*, 452 F.3d at 1206 (pending "habeas petition [was] construed as a petition for review and transferred to [the court of appeals] by the district court where he filed it"); *Enwonwu*, 438 F.3d at 27 (generally same). If Mr. Sied's habeas petition could be reviewed immediately by the court of appeals, like the petitions in *Alexandre* and *Enwonwu*, there would be no need for this court to exercise jurisdiction. But unlike those petitioners, Mr. Sied can make his way to the Ninth Circuit only after going through the IJ and the BIA. And the government threatens to deport him while he tries to make his way through that process. *Alexandre* and *Enwonwu* do not apply.

Second, the government cites *Muka v. Baker*, 559 F.3d 480 (6th Cir. 2009). That case is factually distinguishable. There, the petitioners applied for asylum and withholding of removal before an IJ, who denied their applications and ordered them removed. *Id.* at 481. The petitioners then appealed to the BIA, which affirmed the IJ, and then filed a petition for review with the Sixth Circuit, which denied the petition. *Id.* Following this denial, the petitioners filed a habeas petition in district court, directly challenging the order of removal. *Id.* The petitioners asked the district court "to review the lawfulness of the order of removal entered against [them] and to issue an immediate stay of removal pending the outcome of these proceedings." *Id.* By contrast, Mr. Sied

does not challenge his removal order.[72] Also, the *Muka* petitioners raised arguments based on facts that occurred nearly a year before the IJ issued their removal orders, and the Sixth Circuit thus held that the petitioners could have raised them in the removal proceeding. *Id.* at 485–86. The Sixth Circuit held that "[s]imply because the Mukas failed to make a known argument during their prior proceedings does not mean that we must grant them a second bite at the apple[.]" *Id.* at 486. By contrast, Mr. Sied's motion to reopen — based on changed conditions in Eritrea beginning in the fall of 2017 — occurred over a year after the IJ issued his removal order. *Cf. Amarjeet Singh*, 499 F.3d at 979 (noting relevance of timing where basis for habeas petition arises only after the original order of removal is issued).

Finally, the government cites *Luna v. Holder*, 637 F.3d 85 (2d Cir. 2011). That case, like *Muka*, is factually inapposite. *Luna* did not involve a habeas petition filed in district court. Rather, the petitioners filed petitions for review in the Second Circuit of the BIA's final decisions and thus had been afforded the opportunity to pursue the entire administrative process from IJs to the BIA and then to the court of appeals. *Id.* at 88.

Moreover, *Luna*'s legal analysis supports Mr. Sied's position and not the government's. The issue in *Luna* was that the petitioners' petitions to the Second Circuit were untimely. *Id.* at 87–88. The petitioners argued that the filing requirement deadline, as applied to them, was unconstitutional, because it barred them from raising constitutional claims through a subsequent habeas petition. *Id.* at 87. The Second Circuit held, however, that the petitioners could file motions to reopen before the BIA, those motions were an "adequate and effective substitute for habeas," and the process was therefore constitutional. *Id.* at 104.

In reaching that holding, the Second Circuit stressed that (among other things) "[f]or a motion to reopen to be a constitutionally adequate substitute for habeas, it cannot be 'subject to manipulation' by the Government." *Id.* at 99 (quoting *Boumediene v. Bush*, 553 U.S. 723, 765–66

---

[72] *Compare Muka*, 559 F.3d at 481 (requesting the district court "to review the lawfulness of the order of removal") *with* Pet. for Writ of Habeas Corpus – ECF No. 1 at 8 (¶ 26) ("Petitioner Sied does not challenge the validity of his initial asylum decision or his final order of removal").

(2008)). An issue in *Luna* was a regulation (the "departure-bar regulation") that provided that if an alien were removed from the United States before his motion to reopen was decided, the motion would be considered withdrawn. *Id.* at 100 (citing 8 C.F.R. § 1003.2(d)). The Second Circuit held that the departure-bar regulation would allow the government to manipulate the process by deporting aliens before their motions to reopen were decided, and then rejecting their motions out-of-hand as barred by the departure-bar regulation. *Id.* at 99–102. This would allow the government to deprive aliens of their statutory right to move to reopen their proceedings. *Id.* The Second Circuit therefore held that the departure bar regulation was unenforceable: "because the writ of habeas corpus is 'designed to restrain' the Government's power, the Government must ensure that the motion to reopen process remains an adequate and effective substitute for habeas." *Id.* at 102 (citing *Boumediene*, 553 U.S. at 765–66).

That holding — that motions to reopen are not adequate where the government can manipulate the motion-to-reopen process — supports Mr. Sied's position, not the government's. If motions to reopen are not adequate if the government can deport an alien and thereby render him unable to pursue his motion because he is barred by regulation, it follows that they are not adequate if the government can deport an alien and thereby render him unable to pursue his motion because he may be tortured or killed. *Luna* undermines the government's position that motions to reopen are adequate substitutes for habeas, at least where — as here — the government can manipulate the process.

> ### 1.2.4 The district-court cases that the government cites are not persuasive in establishing that Section 1252(a)(5) or (b)(9) divests the court of jurisdiction over Mr. Sied's habeas petition, particularly in light of countervailing Ninth Circuit precedent

Finally, the government cites cases where district courts have held that Section 1252(a)(5) or (b)(9) divested them of jurisdiction to hear habeas petitions. These decisions do not persuade. First, one of the cases that the government cites — *De Leon v. Napolitano*, No. C 09-3664 JW, 2009 WL 4823358 (N.D. Cal. Dec. 10, 2009) — involves a different fact scenario. The *De Leon* petitioner sought review of ICE's denial of her application for a stay of removal. *Id.* at *1. The Ninth Circuit issued a temporary stay. *Id.* After the government denied her request for deferral of

action, the petitioner filed a habeas petition in district court, and the district court granted her unopposed motion for a stay of execution of removal. *Id.* at *2. The petitioner then voluntarily dismissed her Ninth Circuit petition. *Id.* In her district-court habeas petition, the petitioner asked for a stay of removal and a review of her underlying removal order. *Id.* ("Petitioner moves the Court to review the BIA's May 25, 2005 final administrative order of removal"). Because the habeas petition was a direct challenge to an order of removal, the court held that it lacked jurisdiction under Sections 1252(a)(5) and (b)(9). *Id.* at *3–4. By contrast, Mr. Sied does not challenge his underlying removal order, and he has not forgone his remedy in the Ninth Circuit.

The government cites other cases that present a true conflict. Certain district courts are split on the extent of Sections 1252(a)(5) and (b)(9)'s reach. For example, in *Lopez v. DHS*, No. CV 10-7929 AG(JC), 2010 WL 4279314 (C.D. Cal. Oct. 21, 2010) and *Ma v. Holder*, 860 F. Supp. 2d 1048 (N.D. Cal. 2012), the petitioners filed motions to reopen and requested stays of removal from an IJ and the BIA, respectively, and when the IJ and BIA did not rule on the motions, filed district-court habeas petitions to stay removal. *Lopez*, 2010 WL 4279314, at *1–2; *Ma*, 860 F. Supp. 2d at 1050–51, 1054. The courts held that Sections 1252(a)(5) and (b)(9) divested them of jurisdiction to consider the petitions. *Lopez*, 2010 WL 4279314, at *1–2; *Ma*, 860 F. Supp. 2d at 1061–62. But those decisions arguably conflict with *Gbotoe*. There, a different district court held that it had jurisdiction to consider a habeas request for a stay in connection with a motion to reopen: "*[i]f this Court declines to exercise jurisdiction to review his stay, Gbotoe will have no forum to seek review of the agency's decision prior to his removal.*" *Gbotoe*, 2017 WL 6039713, at *4 (emphasis in original). The judge in *Gbotoe* distinguished his earlier opinion, *Arce v. Holder*, No. C 12-04063 WHA, 2012 WL 3276994 (N.D. Cal. Aug. 9, 2012). In *Arce*, he held that he did not have jurisdiction to consider a habeas request for a stay to allow a motion to reopen because Mr. Arce had not filed a motion to stay before the BIA. By contrast, the petitioner in *Gbotoe* had filed a motion for a stay before the BIA. *Gbotoe*, 2017 WL 6039713, at *3. This distinction arguably conflicts with *Chhoeun*, where a different district court held that it had jurisdiction to consider a habeas request for a stay even though the petitioners had not yet filed motions for stay

before IJs or the BIA. *Chhoeun*, 2018 WL 566821, at *1 ("Petitioners request that their removals be enjoined . . . in order to file motions to reopen" that had not yet been filed).

Faced with these different district-court decisions, the court looks to binding Ninth Circuit precedent. As discussed above, given the Ninth Circuit's decisions in *Amarjeet Singh*, *Toufighi*, and *Shaboyan*, the court concludes that Sections 1252(a)(5) and (b)(9) do not divest it of jurisdiction over Mr. Sied's petition.[73]

## 2. Section 1252(d)(1) Does Not Divest This Court of Jurisdiction over Mr. Sied's Petition

Section 1252(d)(1) provides, "A court may review a final order of removal only if — the alien has exhausted all administrative remedies available to the alien as of right." By its own terms, Section 1252(d)(1) does not apply when the alien is not requesting a review of his underlying removal order. *See, e.g.*, *Curva v. U.S. Citizenship & Immigration Servs.*, No. CV 09-06086 DDP (Ex), 2010 WL 11530932, at *3 (C.D. Cal. Jan. 11, 2010) (citing *ANA Int'l, Inc. v. Way*, 393 F.3d

---

[73] The conflicting district-court decisions have addressed *Amarjeet Singh*. But the cases that the government cites — holding that Sections 1252(a)(5) and (b)(9) divested their courts of jurisdiction — have not squarely confronted *Shaboyan* and its holding that a request for a stay of removal is not a direct challenge to the underlying removal order. The only district court to consider *Shaboyan* relied on it to hold that Sections 1252(a)(5) and (b)(9) did not divest it of jurisdiction. *Gbotoe*, 2017 WL 6039713, at *4 (citing *Shaboyan*, 652 F.3d at 990). Likewise, none of the district court cases that the government cites have squarely confronted *Toufighi* and its holding that a motion to reopen based on changed country conditions is not a direct challenge to a removal order.

At the March 1 hearing, the government for the first time raised a new argument that *Shaboyan* supports its position that district courts lack jurisdiction to consider habeas petitions like Mr. Sied's. In *Shaboyan*, the BIA denied an alien's motion to stay removal without ruling on her underlying motion to dismiss. The alien petitioned the Ninth Circuit for review of the BIA's denial of a stay motion, but the Ninth Circuit declined the petition and held that it would only review a final order, i.e., the BIA's eventual decision on the underlying motion to reopen. The government argued that *Shaboyan* supported its argument that this court lacks jurisdiction over Mr. Sied's habeas petition. But *Shaboyan* involved a direct petition for review of a BIA order, not a habeas petition. Regarding the latter, the Ninth Circuit has held that "the jurisdiction-stripping provision [of the REAL ID Act] does not apply to federal habeas corpus petitions that do not involve final orders of removal." *Nadarajah v. Gonzales*, 443 F.3d 1069, 1075 (9th Cir. 2006). As the *Gbotoe* court held, while the Ninth Circuit may decline to accept direct petitions for review of non-final orders from the BIA, this does not divest district courts of collateral habeas jurisdiction, as otherwise "*[aliens] will have no forum to seek review of the agency's decisions prior to [their] removal.*" *Gbotoe*, 2017 WL 6039713, at *4 (emphasis in original) (citing *Shaboyan*, 652 F.3d at 990).

886, 891 (9th Cir. 2004)). Mr. Sied is not requesting a review of his underlying removal order on this habeas petition, and hence Section 1252(d)(1) does not apply.

Separately, to the extent that the government is arguing that Section 1252(d)(1)'s exhaustion requirement means that Mr. Sied must fully pursue the motion-to-reopen process before he can bring this habeas petition, its argument fails for at least two additional reasons. First, Section 1252(d)(1) does not require aliens to exhaust motions-to-reopen remedies before bringing a claim in federal court. *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007). Second, requiring Mr. Sied to exhaust the motion-to-reopen process before he can bring a habeas petition places him in an untenable catch-22: the basis for Mr. Sied's habeas petition is that the government may block him from exhausting the motion-to-reopen process. The government cannot insist that Mr. Sied exhaust the motion-to-reopen process before he can bring a claim in federal court, on the one hand, while reserving for itself the right to deport him and thereby prevent him from being able to fully exhaust the process, on the other. Because the administrative motion-to-reopen process does not provide an avenue for Mr. Sied to challenge that the process itself is unconstitutional, he is not required to exhaust it before he can bring his habeas claim. *Cf. Padilla-Padilla v. Gonzales*, 463 F.3d 972, 977 (9th Cir. 2006) (rejecting argument that aliens failed to exhaust their remedies as required by Section 1252(d)(1) "[b]ecause the BIA could not have addressed the [petitioners]' constitutional due process claim, [so] the [petitioners] were not required to exhaust the issue before the BIA.").

For the foregoing reasons, Section 1252(d)(1) does not divest this court of jurisdiction to hear Mr. Sied's habeas petition.

### 3. Section 1252(g) Does Not Divest This Court of Jurisdiction over Mr. Sied's Petition

Section 1252(g) provides, in relevant part, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." Section 1252(g) differs from Sections 1252(a)(5), (b)(9), and (d)(1) in that it does not address judicial review of an underlying removal order. *Kwai Fun Wong v. United States*, 373

F.3d 952, 964 (9th Cir. 2004) (holding that Section 1252(g)'s provision stripping jurisdiction with respect to executing removal orders "should be interpreted narrowly, and not as referring to the underlying merits of the removal decision") (citing *Maharaj v. Ashcroft*, 295 F.3d 963, 965 (9th Cir. 2002)). Instead, Section 1252(g) divests courts of jurisdiction only over certain discretionary decisions by the Attorney General. *Catholic Soc. Servs., Inc. v. INS*, 232 F.3d. 1139, 1150 (9th Cir. 2000) (en banc) ("As interpreted by the Supreme Court in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 482–83 (1999), [Section 1252(g)] applies only to the three specific discretionary actions mentioned in its text, not to all claims relating in any way to deportation proceedings.").

The Ninth Circuit has held consistently that Section 1252(g) should be interpreted narrowly. *United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (en banc) (citing *Barahona-Gomez v. Reno*, 236 F.3d 1115, 1120–21 (9th Cir. 2001)). The focus of Section 1252(g) is to limit "judicial constraints upon prosecutorial discretion." *Id.* (citing *Am.-Arab Anti-Discrimination*, 525 U.S. at 485 n.9).

By contrast, Section 1252(g) does not divest courts of jurisdiction over cases that do not address prosecutorial discretion and address "a purely legal question, which does not challenge the Attorney General's discretionary authority[.]" *Id.* Among other things, Section 1252(g) does not "prevent [a] district court from exercising jurisdiction over . . . due process claims [that] do not arise from a 'decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien,' but instead constitute 'general collateral challenges to unconstitutional practices and policies used by the agency.'" *Barahona-Gomez*, 236 F.3d at 1118 (quoting *Walters v. Reno*, 145 F.3d 1032, 1052 (9th Cir. 1998)).

Consequently, the Ninth Circuit has rejected arguments that Section 1252(g) divests courts of jurisdiction to hear claims of due-process violations such as allegations that the government violated due process by refusing to issue any decisions granting aliens a suspension of deportation, *see Barahona-Gomez*, 236 F.3d at 1117–21, allegations that the government violated due process by refusing to accept aliens' legalization applications, *see Catholic Soc. Servs.*, 232 F.3d at 1144, 1150, or allegations that the government violated due process by seizing aliens' green cards and

failing to provide them notice that they had to surrender for deportation, *see Sulit v. Schiltgen*, 213 F.3d 449, 452–53 & n.1 (9th Cir. 2000).

The government cites no Supreme Court or Ninth Circuit cases that have held that Section 1252(g) divests a district court of jurisdiction to hear a habeas petition asking to stay removal or alleging a due-process violation. The government relies on the same district-court decisions it cited in connection with its Sections 1252(a)(5) and (b)(9) arguments, but again, district-court decisions are split on the issue. *Compare, e.g.*, *Chhoeun*, 2018 WL 566821, at *8 (holding that Section 1252(g) did not divest court of jurisdiction to hear habeas petitions requesting stays of removal) *with, e.g.*, *Lopez*, 2010 WL 4279314, at *2 (holding that Section 1252(g) did divest court of jurisdiction). Given the Ninth Circuit's pronouncements that Section 1252(g) should be interpreted narrowly, *Hovsepian*, 359 F.3d at 1155, and that it does not "prevent [a] district court from exercising jurisdiction over . . . 'general collateral challenges to unconstitutional practices and policies used by the agency,'" *Barahona-Gomez*, 236 F.3d at 1118, and given the lack of countervailing Supreme Court or Ninth Circuit precedent, the government has not established that Section 1252(g) divests the court from hearing Mr. Sied's habeas petition.

### 4. An Interpretation That Section 1252(a)(5), (b)(9), (d)(1), or (g) Divests the Court of Jurisdiction over Mr. Sied's Habeas Petition Would Violate the Suspension Clause

As discussed above, Sections 1252(a)(5), (b)(9), (d)(1), and (g) do not divest the court of jurisdiction over Mr. Sied's petition. But if they did divest jurisdiction, given the specific facts of this case, they would violate the Suspension Clause of the U.S. Constitution.

The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2. "The Supreme Court has held that 'because of that Clause, some judicial intervention in deportation cases is unquestionably required by the Constitution.'" *Singh v. Mukasey*, 553 F.3d 1103, 1106 (9th Cir. 2008) (*Massa Singh*) (internal brackets omitted) (quoting *INS v. St. Cyr*, 533 U.S. 289, 300 (2001)). For a statute to be read as limiting the writ of habeas corpus, it "must overcome both the strong presumption in favor of judicial review of

administrative action and the longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction." *St. Cyr*, 533 U.S. at 298.

"Congress may eliminate the writ without running afoul of the Suspension Clause so long as it provides 'a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention.'" *Massa Singh*, 533 F.3d at 1106 (quoting *Swain v. Pressley*, 430 U.S. 372, 381 (1977)). "An adequate substitute for habeas corpus must fulfill the traditional role of the writ, which is to give the petitioner 'a meaningful opportunity to demonstrate that he is being held pursuant to the erroneous application or interpretation of relevant law.'" *Id.* (inner internal quotation marks omitted) (quoting *Boumediene*, 553 U.S. at 779). As the en banc Ninth Circuit has held, leaving an alien in "legal limbo" — where the alien is left with no "judicial remedy — may raise serious constitutional concerns because the Suspension Clause 'unquestionably' requires 'some judicial intervention in deportation cases.'" *Lolong v. Gonzales*, 484 F.3d 1173, 1177 (9th Cir. 2007) (en banc) (quoting *St. Cyr*, 533 U.S. at 300). If a substitute does not give a petitioner a meaningful opportunity to test his detention, the unavailability of the habeas writ may violate the Suspension Clause and therefore be unconstitutional. *Massa Singh*, 533 F.3d at 1107 ("To accept that Congress eliminated habeas corpus without providing these aliens with any substitute for review would pose serious Suspension Clause concerns.") (citing *St. Cyr*, 533 U.S. at 300).

The government argues that Mr. Sied can file a motion to reopen before an IJ and that the motion-to-reopen process provides an adequate substitute for habeas relief.[74] But this, of course, begs the central question at issue: whether the motion-to-reopen process is an adequate substitute. Mr. Sied argues that it is not, at least as applied to him, because it allows the government to manipulate the process by deporting him to Eritrea — where he may be tortured and killed — before his motion to reopen can be heard. This may render the motion-to-open process decidedly inadequate as a substitute for habeas. As *Luna v. Holder* — a case that the government relies on — held:

---

[74] Resp'ts Opp'n – ECF No. 30 at 26.

> For a statutory motion to reopen to be a constitutionally adequate substitute for habeas, it must be available to a diligent petitioner. That is, an alien . . . cannot . . . prevented by [governmental interference] from filing a statutory motion to reopen. . . . For a motion to reopen to be a constitutionally adequate substitute for habeas, it cannot be 'subject to manipulation' by the Government.

*Luna*, 637 F.3d at 98–99 (quoting *Boumediene*, 553 U.S. at 765–66); *accord Massa Singh*, 533 F.3d at 1107 (depriving aliens of adequate substitute process where their claims would be reviewed may violate Suspension Clause); *Lolong*, 484 F.3d at 1177 (same); *see also Castaneda-Suarez v. INS*, 993 F.2d 142, 145 (7th Cir. 1993) (entering stay of deportation while alien's motion to reopen was pending before the BIA and the government refused to agree to stay deportation, because "the execution of deportation order before the final resolution of any (non-frivolous) [motion to reopen] would raise significant equitable, if not constitutional concerns") (citing cases).[75]

Other courts have recently addressed this issue in the context of habeas petitions similar to Mr. Sied's petition and have held that interpreting Section 1252(a)(5), (b)(9), (d)(1), or (g) to divest them of jurisdiction to hear those petitions would violate the Suspension Clause. In *Hamama v. Adducci*, 258 F. Supp. 3d 828 (E.D. Mich. 2017), *appeal docketed*, No. 17-2171 (6th Cir. Sept. 28, 2017), 114 Iraqi nationals who were subject to orders of removal brought habeas petitions seeking

---

[75] The government argues that Mr. Sied "does not present a traditional habeas claim, and so the Suspension Clause does not apply." Resp'ts Opp'n – ECF No. 30 at 21. The government argues that because Mr. Sied is not seeking a full release from custody, his claim is not cognizable on a habeas petition. *See id.* at 21–22. But "custody" in the context of immigration and removal includes not only physical detention but also being subject to a final order of removal. *Nakaranurack v. United States*, 68 F.3d 290, 293 (9th Cir. 1995) (citing cases); *accord, e.g., Jimenez v. Napolitano*, No. C-12-03558-RMW, 2013 WL 5442377, at *2 (N.D. Cal. Sept. 30, 2013) (same) (citing *Nakaranurack*, 68 F.3d at 293). As the Ninth Circuit has recognized, a challenge to an unlawful portion of that custody — a deprivation of a "day in court" — is cognizable on a habeas petition. *Amarjeet Singh*, 499 F.3d at 979 (recognizing a "habeas petition [that] will lead to nothing more than 'a day in court'" as cognizable).

The government's citation to *Munaf v. Green*, 553 U.S. 674 (2008) is inapposite. *Munaf* addressed U.S. citizens who had traveled voluntarily to Iraq and allegedly committed crimes there, and who were then captured by multinational forces. *Id.* at 679. They filed habeas petitions, not seeking release but seeking instead to prevent their transfer to the custody of Iraqi officials. *Id.* at 692. The Supreme Court noted that "[a]t the end of the day, what petitioners are really after is a court order requiring the United States to shelter them from a sovereign government seeking to have them answer for alleged crimes committed within that sovereign's border." *Id.* at 694. The Court held that this request "would interfere with Iraq's sovereign right to 'punish offenses against its laws committed within its borders'" and denied the petitions. *Id.* (citation omitted). No similar issue is presented here.

stays of deportation. The petitioners sought to file motions to reopen on the basis of changed country conditions in Iraq, including the rise of ISIS, that arose only after their original removal orders were entered. *Id.* at 830–32. The government argued that Section 1252(g) divested the district court of jurisdiction to hear the petitions. *Id.* at 834. The court held that such an interpretation would violate the Suspension Clause. *Id.* The court held that Section 1252(g) was not facially unconstitutional, but that it was unconstitutional as applied to the petitioners at issue. *Id.* at 839–40. In rejecting the government's arguments that motions to reopen provided an adequate substitute for habeas, the court wrote:

> Without a stay in place, deportations will begin immediately, which may mean a death sentence for some deportees. Petitioners have presented significant evidence — not contested by the Government — that many will face death . . . Obviously, deportees who are murdered will never have the opportunity to present their arguments that their removal orders are prohibited by the [Convention Against Torture] or the [Immigration and Nationality Act].

> While death is certainly the most egregious outcome deportees face, other persecution would also compromise their ability to pursue their removal challenges from foreign shores. Petitioners have presented evidence — not contested by the Government — that they may well face torture and severe discrimination. . . .

> Deportees who must undertake evasive action to avoid these grave challenges — changing residences, leaving jobs — will be deprived of the stability that is often necessary to properly pursue legal challenges. Maintenance of legal paperwork and communication with lawyers and potential witnesses would likely become extraordinarily problematic, if not impossible.

> . . . .

> The totality of these facts leads to the conclusion that casting Petitioners out of this court without a stay — in the extraordinary context of this case — would ignore the reality that the process for judicial review provided for in the Real ID Act would not be adequate or effective in protecting their habeas rights. The destructive impact would critically compromise their ability to file and prosecute motions to reopen — a legal right that the Supreme Court has characterized as "an 'important safeguard' intended 'to ensure a proper and lawful disposition' of immigration proceedings." To enforce § 1252(g) in these circumstances would amount to a suspension of the right to habeas corpus. The Constitution prohibits that outcome.

*Id.* at 840–42 (citations omitted).

Similarly, in *Devitri v. Cronen*, __ F. Supp. 3d __, No. 17-11842-PBS, 2018 WL 661518 (D. Mass. Feb. 1, 2018), *appeal of earlier order docketed*, No. 17-2160 (1st Cir. Dec. 6, 2017), 50 Indonesian Christians who were subject to orders of removal brought habeas petitions seeking

stays of deportation. The petitioners sought to file motions to reopen on the basis of changed country conditions in Indonesia due to a "rising tide of extremist Islam" that arose only after their original removal orders were entered. *Id.* at *2. The government argued that Section 1252(g) divested the district court of jurisdiction to hear the petitions. *Id.* at *4. In rejecting the government's arguments that motions to reopen provided an adequate substitute for habeas, the court wrote:

> I find that the BIA's processes for adjudicating motions to reopen and motions to stay are *not* adequate administrative alternatives to habeas for these Petitioners. . . . Petitioners have provided persuasive evidence demonstrating that it is likely that the BIA will not rule on their non-emergency motions to stay before they are deported. Thus, under this Kafkaesque procedure, they will be removed back to the very country where they fear persecution and torture while awaiting a decision on whether they should be subject to removal because of their fears of persecution and torture. Petitioners have proven by a preponderance of the evidence that the BIA's procedures will not be adequate to protect their due process rights and their rights under asylum law, the [Convention Against Torture], and the [Immigration and Nationality Act]. Thus, as applied to the circumstances of this case, 8 U.S.C. § 1252(g) is a violation of the Suspension Clause, and this Court has habeas and federal-question jurisdiction over Petitioners' statutory and Constitutional claims.

*Id.* (emphasis in original, citations omitted).

Similarly, in *Ibrahim v. Acosta*, No. 17-cv-24574-GAYLES, 2018 WL 582520 (S.D. Fla. Jan. 26, 2018), Somali nationals who were subject to orders of removal brought habeas petitions seeking stays of deportation. The petitioners sought to file motions to reopen on the basis of changed country conditions in Somalia, including the rise of Al-Shabaab (and a botched attempt by the United States to deport them to Somalia, which resulted in extensive media coverage that only put the petitioners further on Al-Shabaab's radar as targets for persecution and execution), that arose only after their original removal orders were entered. *Id.* at *2–3. The government argued that Sections 1252(a)(5), (b)(9), and (g) divested the district court of jurisdiction to hear the petitions. *Id.* at *4–5. In rejecting the government's arguments that motions to reopen provided an adequate substitute for habeas, the court wrote:

> The Court recognizes that section 1252(g) generally divests the district courts of jurisdiction to review any claim arising from a decision by the government to execute a removal order. However, that law violates the Suspension Clause as applied if it deprives Petitioners of a meaningful opportunity to exercise their statutory right to file motions to reopen their immigration cases in a manner that comports with the onerous statutory and regulatory requirements.

. . . . Petitioners cannot effectively pursue motions to reopen from Somalia where they would likely be forced underground to avoid persecution immediately upon arrival. The Court is unpersuaded by the government's position that Petitioners can meaningfully pursue a motion to reopen from Somalia. It is unclear how Petitioners could access their immigration files or witnesses in the United States with relevant information pertaining to the December 7th flight, all the while attempting to avoid persecution in Somalia.

The motion to reopen process can be an adequate and effective alternative to habeas relief only if individuals are given a meaningful opportunity to exercise their rights guaranteed by law. Based on the unique circumstances of this case, including the botched flight, the resulting news coverage, and escalation of violence in Somalia, the Court finds it has limited jurisdiction to ensure Petitioners are able to exercise rights afforded to them under U.S. law.

*Id.* at *6 (citations omitted).

The reasoning of these decisions is compelling. The motion-to-reopen process is a facially adequate substitute for habeas when it does not deprive an alien of his opportunity to be heard. It is not a constitutionally adequate substitute process in the facts of this case, where the government can manipulate the process by deporting Mr. Sied before he can be heard, to a country where he may be tortured or killed.

\*　　　\*　　　\*

For the foregoing reasons, the court holds that Sections 1252(a)(5), (b)(9), (d)(1), and (g) do not apply and that it has jurisdiction to hear Mr. Sied's habeas petition.


## PRELIMINARY-INJUNCTION ANALYSIS

The court now turns to Mr. Sied's request for a preliminary injunction staying the government from deporting him.

"A plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). Additionally, where the plaintiff has satisfied the second, third, and fourth factors, the first factor is also satisfied if the plaintiff has raised "at least serious questions on the merits." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *accord Leiva-Perez v. Holder*, 640

F.3d 962, 970 (9th Cir. 2011) ("[A] petitioner seeking a stay of removal must show that irreparable harm is probable and either: (a) a strong likelihood of success on the merits and that the public interest does not weigh heavily against a stay; or (b) a substantial case on the merits and that the balance of hardships tips sharply in the petitioner's favor.").

### 1. Mr. Sied Has Raised Serious Questions on the Merits of His Habeas Claim

Mr. Sied has raised serious questions on the merits of his habeas claim, namely, that the government is depriving him of his due-process rights. As the Ninth Circuit has held, "it [is] absurd to conclude that Congress intended to allow motions to reopen to be filed but not heard. . . . Preventing aliens from receiving decisions on their motions to reopen would eliminate all possibility of redress if their circumstances changed." *Azarte v. Ashcroft*, 394 F.3d 1278, 1289 (9th Cir. 2005), *overruled on other grounds by Dada*, 554 U.S. 1.[76] But that absurdity may be what is happening here. Mr. Sied has filed a motion to reopen, as is his statutory right. The government concedes that if it deports him, he would not be able to pursue his motion from Eritrea.[77] But the government refuses to agree to not deport him before his motion can be heard. Mr. Sied has submitted evidence — unrebutted by the government — that if he is deported, the Eritrean government may torture, murder, or disappear him. If he is detained, dead, or disappeared, he will have no opportunity to be heard on his motion to reopen. This raises serious questions about whether he is being deprived of due process. The first preliminary-injunction factor is satisfied.

---

[76] *Azarte* addressed the issue of how a court of appeals should handle the BIA's failure to rule on an alien's motion to reopen before the alien's deadline to voluntarily depart the United States. A voluntary departure terminates the motion to reopen. The BIA's delay therefore put aliens in the position of having to violate their voluntary departure orders, which would subject them to additional penalties, *see Azarte*, 394 F.3d at 1282 n.2 (citing 8 U.S.C. § 1229c(d)), or to abandon their motions to reopen. The Ninth Circuit solved this dilemma by holding that motions to reopen tolled the voluntary-departure period. *Id.* at 1289. The Supreme Court found another solution, holding that aliens who filed motions to reopen must be given the opportunity to withdraw their voluntary-departure requests. *Dada*, 554 U.S. at 21. While *Dada* overruled the particular solution in *Azarte* for the motion-to-reopen-versus-voluntary-departure quandary, both cases and both holdings affirm the underlying principle that an alien who files a motion to reopen must be given an opportunity for that motion to be heard.

[77] Dec. 11, 2017 Hr'g Tr. – ECF No. 27 at 30.

### 2. Mr. Sied Has Shown That He Is Likely to Suffer Irreparable Harm in the Absence of a Stay

Mr. Sied has shown that he is likely to suffer irreparable harm in the absence of a stay. The government's position threatens to deprive Mr. Sied of due process, and "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). Additionally, Mr. Sied has submitted unrebutted evidence that if he is deported to Eritrea, he may be tortured or killed. Torture and death are irreparable harm. The second preliminary-injunction factor is satisfied.

### 3. Mr. Sied Has Shown That the Balance of Equities Tips Strongly in His Favor

The balance of equities sharply favors Mr. Sied. The government has not identified any meaningful burden or hardship that it would suffer if a stay were granted (other than possibly the custodial expense of detaining Mr. Sied). A stay maintains the status quo. By contrast, without a stay, if the government deports Mr. Sied, he potentially would suffer great burden and hardship: the effective loss of his statutory right to file a motion to reopen (because, as the government concedes, he would not be able to pursue the motion from Eritrea), and the potential loss of his life and liberty if the Eritrean government persecutes him. The third preliminary-injunction factor is satisfied.

### 4. Mr. Sied Has Shown That a Stay Is in the Public Interest

A stay of removal to allow Mr. Sied to be heard on his motion to reopen is in the public interest. The public interest favors proper and lawful dispositions of immigration proceedings. As the Supreme Court has held, motions to reopen are "an 'important safeguard' intended 'to ensure a proper and lawful disposition' of immigration proceedings." *Kucana*, 558 U.S. at 242 (quoting *Dada*, 554 U.S. at 18). "[T]here is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436. While there is a countervailing "public interest in prompt execution of removal orders," *id.*,

that interest is outweighed here, given the potential due-process issues that a rushed "prompt" deportation of Mr. Sied would raise. *Hernandez*, 872 F.3d at 996 ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.") (quoting *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)).

*     *     *

The court grants Mr. Sied's motion for a preliminary injunction staying the government from deporting Mr. Sied while he pursues his motion to reopen.

## CONCLUSION

The court has jurisdiction to hear Mr. Sied's habeas petition. The court issues a preliminary injunction and orders that the government may not remove Mr. Sied from the United States. This injunction and order will terminate in connection with any of the following events:

1. a final non-appealable decision vacating Mr. Sied's May 10, 2016 removal order;

2. Mr. Sied's failure to (1) timely appeal to the BIA a final adverse ruling from an IJ on his motion to reopen and (2) file a simultaneous motion to stay removal with the BIA;

3. Mr. Sied's failure to (1) timely petition for review before the appropriate United States Court of Appeals a final adverse ruling from the BIA on his motion to reopen and (2) file a simultaneous motion to stay removal with the Court of Appeals; or

4. a decision on a motion to stay removal by the Court of Appeals.

**IT IS SO ORDERED.**

Dated: March 2, 2018

_____
LAUREL BEELER
United States Magistrate Judge